BERTHA NEWTON, Respondent, v. M. GRETTER and John Gretter, and M. Gretter as Guardian ad Litem for John Gretter, Appellants.

(236 N. W. 254.)

Opinion filed April 15, 1931.

*Richardson, Thorp & Wattam* and *Frank J. Campbell,* for appellants.

*Pierce, Tenneson, Cupler & Stambaugh, Frank E. Shaw,* and *Kvello & Adams,* for respondent.

638

BURKE, J. This is an appeal from a judgment for the plaintiff, for personal injury in an automobile accident. Plaintiff and her husband live at the town of Sheldon, North Dakota, and on Thanksgiving Day, 1929, they drove in their Ford automobile from Sheldon, a distance of six miles, to Enderlin to spend the day and evening with the plaintiff's father and mother. They traveled on highway "Ransom County A," that being the direct road between Enderlin and Sheldon. They started home about 10:30 or 11 o'clock at night. After they had driven about a half mile the head light on the right hand side went out. En route there is a tree claim and trees extending for a full half mile on the south side of the road. Along this part of the highway the snow had drifted and was about eight inches deep on the north side of the road and from three to six inches deep on the south side. The traffic was along the south side of the road and there were three meandering crooked ruts in the icy, hard, snow-packed road, three or four inches deep at the point where the accident happened. All traffic was in these ruts and the plaintiff and her husband claim that as they were traveling in the south ruts they saw the defendants' car approaching with "terrific speed," and they turned out of the ruts to the right hand side of the road and stopped to let the defendants pass. They testified that when they stopped, "their car was straddling the extreme south rut so that the center rut and the north rut were open with sufficient space for defendants' car to pass in safety;" that the left hand light in their car was bright and lit up the road for a distance of two hundred feet; that defendants' car was a quarter of a mile away when they turned out of the ruts; that defendants' car came on at a terrific speed with but one light; that they could not tell which light, in the distance, but saw later that it was the light on the right hand side of the car; that when the car was ten or twelve feet away they realized

that they were going to be struck; that they were struck, the rim of the left hand light on defendants' car making an impression of a ring on the radiator of the Ford car. The Ford car was lifted up and thrown back some ten feet and lay on its side south of the road, partly in the ditch, with defendants' car right up against it.

The testimony of the plaintiff and her husband is corroborated in some respect by Roy Torfin. He said: "We took particular notice to the place where George had driven up and stopped and we kicked the snow aside and found that his right wheels were as near to the shoulder of the road as he could possibly get without going into the ditch." Q. "Did you see the marks of the wheels of his car—could you discern them? A. We did in the snow. The left front wheels of George Newton's car were from eight to ten inches from the southernmost rut on that road. I could tell from the marks in the snow the point in which George's front wheels had stopped; he made a new track where these wheel tracks ended. The car had been shoved back and the back end was in a ditch. The imprint of the head light of the Pontiac was on the radiator of the Ford."

The defendants lived at Sheldon and defendant John Gretter had driven to Enderlin on Thanksgiving Day and back to Sheldon and was also familiar with the road. There was a dance in Sheldon on that night and one at Enderlin. John and his brother Joe and Byron Clayton were attending the dance at Sheldon and along between ten thirty and eleven o'clock they concluded to drive over to Enderlin to attend the dance there. All three of the boys rode in the front seat of the Pontiac coach, driving at least a part of the distance at the rate of fifty miles per hour. John Gretter and Byron Clayton testified that John was only going about twenty miles an hour when he ran into the Newton car. He did not apply his brakes or make any effort to stop his car until it was ten feet from the Ford. He saw the Ford when it was a half mile away; knew that he was approaching the ruts, that he had to go to the south side of the road to travel in them; he saw that the Newton car had but one light; he claims that he was in the two north ruts and that when he got within ten feet of the Ford he turned out of these ruts, got his front wheels out, but his rear wheels spun in the ruts and he slid into the Ford. The left front of each radiator was badly damaged and after the collision, both cars were

south of the center of the road, the Ford extending out into the ditch and the Pontiac was nearly against it. Neither car was ever repaired. In making these ruts, as a matter of course, if the car was traveling west with the right wheel in the north rut the left wheel would be in the center rut. If the car was traveling east with the right wheel in the south rut, the left wheel would be in the center rut, no cars could travel in the ruts without using the center rut and cars could not meet and pass unless one car turned out of the ruts leaving two ruts free for the other car to pass in.

It is the contention of the defendants that the plaintiff was guilty of contributory negligence in driving into danger; that he discovered that his right light was out when he was only a short distance from Enderlin and that it was his duty to go back and have his light fixed; that he drove into danger voluntarily and hence cannot recover because of his own contributory negligence. If the plaintiff was negligent in not driving back and fixing his light, such negligence would not prevent a recovery unless that particular act of negligence contributed to the injury. There was no apparent danger when the plaintiff drove into the ruts, it was after they had been driving in the ruts for some little time that they saw the defendants' car coming, as they say, at a terrific speed, and he and the plaintiff claim that they got out of the ruts leaving plenty of room for the defendants to pass in safety.

It is the contention of appellants in specifications of errors numbers thirty-six and thirty-seven, "that the court erred in instructing the jury in substance to the effect that it was the law of this state that where a car is stopped on the highway for the purpose of passing another car, temporarily stopped for some reason on the road, that the law is complied with if the car has one of the two front lights burning." There is no merit to this contention. The law applicable to the situation which the trial judge read to the jury is as follows:

"Whenever a motor vehicle is parked or stopped upon a highway whether attended or unattended during the time mentioned in § 49 (§ 49 requires the lighting of a motor vehicle during a period from a half hour after sunset to a half hour before sunrise) there shall be displayed upon such motor vehicle one or more lamps projecting a white light visible under normal atmospheric conditions from a distance of

five hundred feet to the front of such motor vehicle. . . ." Sess. Laws 1927, § 55, chap. 162.

It will be noted that the statute uses the term "parked or stopped." In either case one light is sufficient provided it can be seen for a distance of five hundred feet and in the case at bar there was one light which defendants admit they could see when they were a half mile away. There was no error in this instruction.

In order to constitute contributory negligence as a matter of law, the facts and circumstances must be such that no other inference can fairly and reasonably be drawn therefrom. Haugo v. Great Northern R. Co. 27 N. D. 268, 145 N. W. 1053; Dougherty v. Davis, 48 N. D. 883, 187 N. W. 616; Ferm v. Great Northern R. Co. 53 N. D. 543, 207 N. W. 39; Axelson v. Jardine, 57 N. D. 524, 223 N. W. 32; Schulkey v. Brown, 59 N. D. 346, 230 N. W. 6; Martin v. Oregon Stages, 129 Or. 435, 277 Pac. 291. In the instant case it can not be said that there was contributory negligence as a matter of law. The question of negligence of the defendants and the contributory negligence of the plaintiff were questions of fact for the jury. It was submitted by the trial judge under very full and explicit instructions and the jury found for the plaintiff as well it might.

Prior to the collision the plaintiff was a strong, healthy woman, engaged continuously in her profession as a trained nurse. According to the testimony of her husband, George Newton, her own testimony and the testimony of her physician, she was severely injured in the collision; she was knocked unconscious; she sustained cuts and bruises, concussion of the brain and a nervous shock; she was confined to her bed for two weeks immediately following the collision and up to the time of the trial, on the 23rd day of June, 1930, she had been unable to do any work. A few months after the collision an exophthalmia or toxic goiter developed, and on the 17th of June, 1930, when she was examined by Doctor Hotchkiss, she had a misplaced uterus and badly congested ovaries, all of which injuries, the doctors testified, were probably caused by the accident and were probably permanent, but might respond to treatment either by operation or the administration of medicine.

Specifications Nos. 1, 2, 3, 4, 5, 6, 7 and 8 relate to the testimony of Doctor Hotchkiss, an expert witness, who testified for the plaintiff.

It is the contention of appellant that Doctor Hotchkiss was not the physician who attended the plaintiff after the accident and that his examination was made some months after the accident and that his testimony is based upon information which he got from the plaintiff. Doctor Hotchkiss testified in substance as follows: I found a decidedly emotional type of individual, extremely nervous, apprehensive, she was oriented as to time and place and persons but was very self-centered, very apprehensive of the outcome of her present physical condition. On physical examination I found that she had a goiter, an enlarged thyroid, commonly called goiter, her heart was rapid and irritable, blood pressure was increased many points above normal and she had a very decided muscular tremor. There was an induration on her left forehead that was the remains of the injury to her head, and a very small scar on the top of her head. Pelvic examination demonstrated a misplaced uterus which was badly congested as were also her ovaries. Those were, I believe, the only symptoms and physical findings that I was able to demonstrate.

"Q. And those, Doctor, were all objective symptoms?

"A. Yes.

"Q. In other words, you discovered those without the plaintiff telling you?

"A. Yes, outside of the fact that she told me of these apprehensive feelings that she had."

Mrs. Newton, the plaintiff, testified on cross-examination as follows:

"Q. So you went down and saw Dr. Hotchkiss?

"A. Yes.

"Q. And that was on the 17th day of this present June?

"A. Yes, sir.

"Q. And you told him the story of this business, and how you had felt, just as you have here in court?

"A. No. I did not, Mr. Thorp. He didn't ask me no questions concerning it.

"Q. But you understood when you went there that Dr. Hotchkiss was to be a witness in this case?

"A. I didn't really understand it that way.

"Q. What?

"A. No, I didn't. . . .

"Q. Up to that time, Dr. Hotchkiss had never treated you?

"A. No, he had not.

"Q. Did you take any medicine that day from him?

"A. No, I didn't.

"Q. You just had an examination and then went away?

"A. That is all."

It seems clear from this testimony that the doctor got very little information from the plaintiff and that his testimony was actually based upon the examination which he made at the time.

Appellants rely upon the case of Hintz v. Wagner, 25 N. D. 110, 140 N. W. 729. That was an action for an assault committed November 6, 1908. The trial occurred in July, 1910. The doctor testified that he had examined the plaintiff on each of two days during the trial for the purpose of qualifying himself to testify as an expert, and over objections he was permitted to tell the jury as to the character and extent of her ailments occasioned by the assault complained of and as to their permanency. He testified that he formed his diagnosis upon "the strength of what I found there, what I made her tell me, her answers to the inquiries I propounded. I diagnosed on that. I began to look into her symptoms, and asked her about it, and wanted to know about the changes from time to time, month after month, in the past, and went through the whole history. The court said: "It must be borne in mind that there was no visible evidences of the injury complained of; that is, no scars or wounds visible, at the time of Dr. Oyen's examination. She claimed to have suffered from headaches, nervousness, sleeplessness, heart, and other troubles, and that at the time of the trial she was still suffering to some extent from them. It is apparent that, under the circumstances, his opinions must have been mainly formed from her statements of past conditions." It does not appear from this decision that there was any physical examination at all of the plaintiff, and that the doctor's testimony was based entirely upon the history of the case as given to him by the plaintiff.

In the case at bar, the doctor based his testimony clearly on what he found from the examination. He said on physical examination, "I found a scar on head, a goiter, a misplaced uterus, an induration on left forehead, and badly congested ovaries. The admission of the doctor's testimony in the Hintz v. Wagner, supra, case, was held error

because not based upon what he found by a personal examination or on what plaintiff had told him for the purpose of enabling him to prescribe for her. Under that decision, if the doctor had based his testimony on a personal examination, it would have been admissible, or if he had based it on information which he received from a patient for the purpose of enabling him to prescribe it would have been admissible. In this case, the doctor's testimony is based on an actual personal physical examination and therefore was admissible.

Practically all of the other specifications of error relate to the objections to the testimony of Doctor Hendrickson and Doctor Hotchkiss, as speculative and conjectural; no causal connection shown. For example, Doctor Hotchkiss is asked:

"Q. Assuming that in this injury she sustained an injury to her back, and that she had pains in her back subsequent to that which she had not had before the collision, state whether or not in your opinion the injuries she received in this automobile collision could have caused this misplacement of the uterus?

"Mr. Thorp. Objected to as speculative and conjectural, no causal connection shown, relating to possibilities and conjectures and might have beens, and not an opinion.

"The Court: Overruled.

"A. It could have caused the misplacement of the uterus, and could have produced the pain in the back and through the nerves that enter the spine from the uterus area."

And again:

"Q. As I understand you, doctor, the condition both in the thyroid and in the uterus as you found them in your examination might have been caused by the automobile collision that I have stated and assumed to have occurred?

"Mr. Thorp: That is objected to as calling for a conjecture and speculation; no foundation laid, not calling for an opinion of the witness.

"The Court: He may answer.

"A. Yes, they might have been caused by the automobile collision and the injuries then received."

Dr. Hotchkiss was asked the following hypothetical question, viz.:

"Q. Now, assuming that the plaintiff, Bertha Newton, was riding

in an automobile which was in a collision in the evening of Thanksgiving day 1929, and that the force of the impact was sufficient to throw the automobile in which she was riding on its side, the plaintiff being in it, and that before the collision the plaintiff had always been in good health and did not have the injury or enlargement to the thyroid which you have described, and that she was knocked unconscious in that collision; that she sustained a slight concussion of the brain; contusion of the left hand and a swelling on her left temple, both her knees were bruised and cut, she sustained a scalp wound, her left side was bruised and still bothers her; the left side was completely black and blue from her knees up to her shoulders along her back; that she sustained a cut on her right hand, sustained a bruised finger and bruised shoulder on her right side; that she was confined to bed for about two weeks immediately following this collision and has ever since been nervous, irritable and on occasions has had hysterical and crying spells, none of which she had prior to the collision, state whether or not in your opinion the injuries which I have described could have been caused by such collision?

"A. It could be responsible for the condition such as I have demonstrated in the examination I made."

11 Ruling Case Law, page 609, § 33, states the rule as follows: "A practicing physician, however, who has attended a patient, or examined him for the purpose of testifying, may state his opinion as to the nature of the disease or disability from which he was suffering, the facts which probably produced or might have produced his condition, the physical or mental effects to be expected from a certain injury or disease, the probable continuance and future course of an existing disease or disability, . . ."

In 21 Ann. Cas. page 326, it is stated: "It seems to be a well-settled rule that where recovery from a personal injury is not complete at the time of the trial of the action therefor, the injured party is entitled not only to damages already accrued, but also to such damages as the evidence shows he will sustain in the future.

"And it seems to be equally well settled that for the purpose of determining what the plaintiff's prospective damages will be, it is competent for a physician and surgeon to express an expert opinion as to the future effects or consequences that may be expected to follow the

injury." Cunningham v. New York C. & H. R. R. Co. (C. C.) 49 Fed. 439; Louisville, N. A. & C. R. Co. v. Falvey, 104 Ind. 422, 3 N. E. 389, 4 N. E. 908; Vohs v. A. E. Shorthill & Co. 130 Iowa, 542, 107 N. W. 417; Meily v. St. Louis & S. F. R. Co. 215 Mo. 567, 114 S. W. 1013; Pullman Co. v. Hoyle, 52 Tex. Civ. App. 534, 115 S. W. 318; Norfolk R. & Light Co. v. Spratley, 103 Va. 379, 49 S. E. 502; Mitchell v. Tacoma R. & Motor Co. 13 Wash. 560, 43 Pac. 528; Morgenstein v. Nejedlo, 79 Wis. 388, 48 N. W. 652; Bucher v. Wisconsin C. R. Co. 139 Wis. 597, 120 N. W. 518; Crosby v. Portland R. Co. 53 Or. 511, 100 Pac. 300, 101 Pac. 204.

"There seems to be no dissent from the rule that a physician or surgeon testifying as an expert may give his opinion as to whether the injury to the plaintiff is permanent or whether a recovery is probable." Cunningham v. New York C. & H. R. R. Co. (C. C.) 49 Fed. 439; Kansas City, M. & B. R. Co. v. Butler, 143 Ala. 264, 38 So. 1024; Southern R. Co. v. Hobbs, 151 Ala. 335, 43 So. 844; Kimic v. San Jose-Los Gatos Interurban R. Co. 156 Cal. 379, 104 Pac. 986; Denver Tramway Co. v. Reid, 4 Colo. App. 53, 35 Pac. 269, 2 Am. Neg. Cas. 248; Anderson v. Wilmington, 6 Penn. (Del.) 485, 70 Atl. 204; Lake Erie & W. R. Co. v. Wills, 39 Ill. App. 655; Noblesville & E. Gravel Road Co. v. Gause, 76 Ind. 142, 40 Am. Rep. 224; Louisville, N. A. & C. R. Co. v. Falvey, 104 Ind. 422, 3 N. E. 389, 4 N. E. 908; Cumberland Teleph. & Teleg. Co. v. Overfield, 127 Ky. 548, 106 S. W. 242; Chesapeake & O. R. Co. v. Wiley, 134 Ky. 461, 121 S. W. 402; McDonald v. City Electric R. Co. 144 Mich. 379, 108 N. W. 85; Holman v. Union Street R. Co. 114 Mich. 214, 72 N. W. 202; Peterson v. Chicago, M. & St. P. R. Co. 38 Minn. 511, 39 N. W. 485; Reichman v. Second Ave. R. Co. 48 Hun, 620, 1 N. Y. Supp. 836; Cook v. New York C. & H. R. R. Co. 49 Hun, 605, 1 N. Y. Supp. 711; Campbell v. New York C. & H. R. R. Co. 49 Hun, 611, 3 N. Y. Supp. 694; New York, C. & St. L. R. Co. v. Ellis, 6 Ohio C. D. 304, 13 Ohio C. C. 704; Wilt v. Vickers, 8 Watts, 227; Palmer v. Warren Street R. Co. 206 Pa. 574, 63 L.R.A. 507, 56 Atl. 49; Missouri, K. & T. R. Co. v. Lynch, 40 Tex. Civ. App. 543, 90 S. W. 511; Norfolk R. & Light Co. v. Spratley, 103 Va. 387, 49 S. E. 502; Taylor v. Ballard, 24 Wash. 191, 64 Pac. 143; Hallum v. Omro, 122 Wis. 337, 99 N. W. 1051.

Doctor Hotchkiss testified that in his opinion the injuries which he

described and which were described to him in a hypothetical question were of a permanent nature. Doctor Hendrickson testified that they were of a permanent nature but might respond to treatment either by an operation or the administration of medicine. There was nothing conjectural or speculative about the injuries or about their future condition. The testimony is that the particular injuries under which the plaintiff was suffering at the time of the trial would probably continue permanently. It seems to be well settled that questions and answers as to what is likely or liable to be the result of the injury are not speculative or conjectural. Vohs v. A. E. Shorthill & Co. 130 Iowa, 542, 107 N. W. 417; Knoll v. Third Ave. R. Co. 46 App. Div. 527, 62 N. Y. Supp. 16, 168 N. Y. 592, 60 N. E. 1113; Graham v. Joseph H. Bauland Co. 97 App. Div. 141, 89 N. Y. Supp. 595; Hallum v. Omro, 122 Wis 337, 99 N. W. 1051. The opinion evidence of the doctors relates specifically to the injury then apparent in the plaintiff, was not speculative nor conjectural, and there was no error in the admission of the testimony. Appellant insists that since Doctor Hendrickson, who was plaintiff's attending physician and had been from the time of the accident until the time of the trial, testified that the injury might respond to treatment; that because of such testimony it was error to submit the question of the permanency of the injuries to the jury. Upon this subject the court instructed the jury as follows:

"In case you find that the plaintiff has to any extent been permanently injured, you should take that into consideration in determining her damages. In determining whether or not plaintiff's injuries will be permanent, you should take into consideration the nature of her injuries as disclosed by the evidence, whether or not such injuries may be cured by the proper remedial medical treatment or care, and whether or not such conditions will be improved or become progressively worse, in the light of all the testimony in this case and under all the surrounding circumstances as disclosed by the evidence."

We are of the opinion that this instruction (in the absence of any request made by appellant for further instructions on the subject), is sufficient on the question of the effect of medical treatment on the injuries. "One who has been injured by the negligence of another must use ordinary diligence to effect a cure. . . . Only ordinary care is required; and where there has been no neglect on the part of the

injured party, and his injuries were more serious, or resulted more seriously than it was at first supposed they would, there can be a full recovery for the entire result." 17 C. J. § 102, p. 778. In the instant case Doctor Hendrickson was called immediately after the accident and continued to treat the plaintiff up until the time of the trial. There is no evidence of any neglect on the part of the plaintiff. The testimony of Doctor Hendrickson that the injuries might respond to treatment or operation is only an opinion, and the permanency of the injuries is only a probability. Medicine is not such an exact science that doctors can say with absolute certainty that an injury is permanent or curable. Again, "Where one has been hurt by the negligence of another he is not bound, as a matter of law, to undergo a serious and critical surgical operation which would necessarily be attended by some risk of failure . . . , but the person injured must be permitted to exercise a liberty of choice under such circumstances." 17 C. J. § 104, p. 779.

In the case of White v. Chicago & N. W. R. Co. 145 Iowa, 408, 124 N. W. 309, a physician testified that the injury "might be remedied by a surgical operation at an expense of from $25 to $50 and the loss of a week or two in time; that such operation would be without pain, upon the administration of an anaesthetic; and that it would not be attended with danger and would result in a better hand which could be used as well. He testified further that he 'would take the fingers off a little farther back, and that would leave a little more covering of the periosteum, and the bones would be down deeper and would not be so tender. . . . I would have the periosteum so that it would not draw so tight, and there would be greater freedom in bending and less tenderness at the ends.' Based on this evidence, the defendant requested the court to instruct the jury that: 'If you find from the evidence that John Humpall's fingers, at the place of amputation, still cause him pain, and that such pain can be obviated by a new amputation, at small expense, and without serious danger to said John Humpall, then you are instructed that it will be the duty of the said John Humpall to have such new amputation, and he will in no event be entitled to recover for any pain or suffering that such new amputation would prevent.' The instruction was refused, and no reference to the subject made in other paragraphs of the charge. The evidence bore on

the character and extent of the injury, and therefore was appropriate for the consideration of the jury as determining the amount of damages to be allowed. Bailey v. Centerville, 108 Iowa, 20, 78 N. W. 831; Keyes v. Cedar Falls, 107 Iowa, 509, 78 N. W. 227." The court said: "Of course, no one can be said to owe the duty of submitting to an operation, especially where the administration of an anaesthetic is necessary in order that it be performed. No right is held more sacred, or is more carefully guarded by the common law, than is the right of every individual to the possession and control of his own person, free from all restraint or interference from others, unless by clear and unquestionable authority of law. As is well said by Judge Cooley: 'The right to one's person may be said to be a right of complete immunity; to be let alone.' Cooley, Torts, 33. Whether an injured person shall submit to further mutilation of his person is essentially a matter of personal choice. This is necessarily so, for experience has demonstrated that every operation is performed with some risk. But when pain may be obviated, and the condition of the injured member improved, by an operation without injury and at small expense and slight inconvenience, the person injured ought not to be recompensed on the theory that he will not avail himself of the benefits of modern surgery. Nor, on the other hand, is compensation to be limited to the reasonable cost of surgery as though the injured person were a chattel being put in state of repair. The feasibility of an operation calculated to obviate pain and improve conditions is to be considered by the jury, not owing to any duty of the injured party to submit his person to the surgeon's knife, but as bearing on the nature and extent of the injury and the probable consequences when accorded such treatment as ordinary prudence shall dictate. Though the instruction was not without fault, the attention of the jury might well have been directed to the feasibility and probable effect of the operation as bearing on the amount of damages to be allowed." That case was reversed on other grounds. In the instant case there was no testimony relating to an operation except that serious operations might be necessary and that the injuries might respond to medical treatment. There was no specific information on the subject as there was in the Iowa case, and there was no specific instruction asked by the defendant as there was in the Iowa case. However, the court did of its own motion tell the jury

that it should take into consideration the nature of the plaintiff's injuries as disclosed by the evidence, whether or not such injuries may be cured by proper remedial medical treatment or care; whether such conditions will be improved or become progressively worse. In the light of all of the testimony in the case it would seem that this instruction fully covers the evidence upon the subject as disclosed by the record.

Appellant cites and relies on the case of McGowan v. Dresher Bros. 106 Neb. 374, 183 N. W. 560. In that case the court said:

"The alleged fault of instruction No. 12 is that it submitted the question of there being a permanent injury, and appellant urges that there is no evidence to sustain such submission to the jury. The plaintiff gave the only testimony as to the injury and its effects. He details the injuries to his ankles, feet, and legs, and in one statement says one of his feet 'was swelled up and was painful and is painful to this day, . . . It swells up occasionally; that has swelled up on me very much until lately and it gets numb at times and practically as if there is no feeling in that foot,' and again he says, in substance, it is painful yet; that he is able to put all his weight on that foot, but sometimes it goes numb for some reason, if he leaves the weight on it and walks with it, and for that reason he has to support it; the foot that got bruised is not a very good foot; the broken foot has swelled occasionally and gets numb for some reason."

That is all the testimony in the case relating to the permanency of the injury. Two doctors testified for the defendant that they had examined the plaintiff, made X-ray pictures of his feet and ankles and testified that "both ankles and feet were normal and the motion of the joints free and they could bend them forward, backward or laterally without causing pain, and that the plaintiff could move them the same way, and the muscles and tendons were not hampered or hindered in their motion, and their range of motion was normal, and found no sign or indication of anything in the bones, nerves or muscles that would cause any disability; that there was indication of there having been a fracture of the internal maleolus, but it is perfectly healed leaving all bones of both feet in normal size, shape and position." The court said: "The plaintiff, under the evidence, is entitled to substantial damages, but the verdict of $3,500 appears excessive, and probably the award

was enhanced by the speculative view of a permanently disabled foot, yet we cannot say that the verdict was the result of passion and prejudice. : . . If the plaintiff remits the sum of $1,000 within 20 days, the judgment will stand affirmed; otherwise, the judgment is reversed."

It will be noted that there is no expert testimony as to the permanency of the plaintiff's injuries in that case. The expert opinion evidence given by the doctors is, in substance, that the fracture had perfectly healed leaving all bones of both feet in normal size, shape and position. The court, being of the opinion that the submission of the question of the permanency of the injuries to the jury when there was no competent evidence to support it resulted in a speculative verdict, reduced the judgment $1,000. In the instant case the expert opinion evidence is, in substance, that the injuries are probably permanent. There is nothing to indicate that the verdict is the result of passion and prejudice and the record amply sustains the verdict.

The judgment is affirmed.

CHRISTIANSON, Ch. J., and NUESSLE, BURR, and BIRDZELL, JJ., concur.