# Richmond

## I. T. Hooker v. Cora Lee Hancock, Administratrix.

October 11, 1948.

Record No. 3361.

Present, All the Justices.

*Woods, Rogers, Muse & Walker*, for the plaintiff in error.

*Kime & Hoback*, for the defendant in error.

MILLER, J., delivered the opinion of the court.

Charles L. Hancock died on the 9th day of October, 1946, as a result of injuries sustained eight days prior thereto when struck by an automobile driven by I. T. Hooker. Cora Lee Hancock, his administratrix, obtained a verdict of $10,000 for the wrongful death of decedent. From a judgment entered thereon, I. T. Hooker obtained this writ of error.

The parties will be hereinafter referred to in accordance with the positions occupied by them in the lower court.

Numerous errors are assigned to rulings of the trial court. They include refusal to set aside the verdict as contrary to the law and evidence, admission of evidence objected to by defendant, giving certain instructions on behalf of plaintiff and refusal of an instruction offered by defendant.

In our opinion the decisive question is whether the evidence conclusively discloses negligence on the part of the decedent which proximately caused or efficiently contributed to his death.

Through there is conflict in the testimony as to the effectiveness of the lookout maintained by defendant immediately before and at the time of collision, yet the evidence insofar as it bears upon decedent's action and movements immediately prior to and at the time of the collision is undisputed; nor can fair-minded men differ as to the inferences to be drawn therefrom. Therefore, the question whether decedent was free from negligence which contributed to the collision is one of law to be decided by the court.

In determining whether this verdict is to be set aside and final judgment entered for the defendant, we are governed by the terms of sec. 6363 of the Code of Virginia, 1942 (Michie). That section provides that when the evidence is certified, which has been done in this instance, "* * * the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." *Orndorff v. Howell*, 181 Va. 383, 25 S. E. (2d) 327.

It must be kept in mind that plaintiff is fortified by

a jury's verdict and the judgment of the trial court—thus he occupies the most favored position known to the law. *Neal* v. *Spencer*, 181 Va. 668, 26 S. E. (2d) 70; *Virginia Elec., etc., Co.* v. *Steinman*, 177 Va. 468, 14 S. E. (2d) 313, and *Tri-State Coach Corp.* v. *Walsh, ante,* p. 299, 49 S. E. (2d) 363.

Only if it plainly appears that decedent was guilty of contributory negligence which caused or efficiently contributed to his death should this court exercise the power given under the preceding section. Yet if that fact is so conclusively established by the evidence that fair-minded men could not differ, then any judgment rendered in plaintiff's favor is *plainly* wrong and it becomes our duty to so decide. *McQuown* v. *Phaup*, 172 Va. 419, 2 S. E. (2d) 330.

When the evidence is viewed as a whole in the light most favorable to plaintiff, it appears that the unfortunate event occurred as follows:

Melrose Avenue, a thoroughfare in the city of Roanoke upon which much traffic passes, runs approximately east and west and its usual width is about fifty feet. Eastwardly from where the collision happened its southern curb or boundary line curves or loops somewhat to the south, which has the effect of materially widening the street for some distance. Where it is widened by this curve on its south side and about midway of the loop, it is intersected from the south by 24th Street, which street, however, does not extend across Melrose Avenue at this point.

The collision happened on the 1st day of October, 1946, at about 7:00 o'clock p. m. Decedent, while hurriedly walking or running from the north to the south side of Melrose Avenue, was struck by defendant's automobile at a point about fifty or sixty feet west of the intersection with 24th Street. He was almost across Melrose Avenue, being about five feet from its southern curb, when hit by the right front fender of defendant's car which was proceeding in an easterly direction and approaching 24th Street. The point of impact took place in front of a filling station on the south side of the street almost at the western end

of the curve or loop in the southern side of Melrose Avenue and where the street is about fifty-two feet wide. Though the collision did not occur at the intersection, it did happen where about seventy-five per cent of the pedestrians cross Melrose Avenue who undertake to do so in that immediate vicinity. It can be crossed more conveniently at this point because it is much narrower here than where it intersects 24th Street.

There is no evidence as to the weather or atmospheric conditions obtaining. The street was reasonably well lighted by the nearby street lights on the north side of Melrose Avenue and lights at the filling station on the south side of the street.

Defendant and his wife were the only occupants of the automobile. It was being driven in the proper lane with the right side of the car about five feet from the southern curb of the street. The headlights were burning and the brakes unimpaired. The speed of the car is rather conclusively established to have been from fifteen to twenty miles per hour, though decedent, shortly before he died, said he thought it probably was about twenty-five miles per hour. It was stopped within six to eight feet after striking decedent.

There is no evidence that defendant was aware that pedestrians usually crossed Melrose Avenue at the place where decedent was struck. He was approaching 24th Street and under a duty to look for pedestrians at that intersection and for vehicular traffic that might cross his path in entering or leaving that street.

There was other traffic on the highway. Two or more automobiles with bright headlights were then proceeding in a westerly direction along Melrose Avenue and so meeting defendant as he neared the place of accident.

At the trial defendant was called as an adverse witness. He testified that lights on approaching automobiles prevented him from seeing decedent until he was almost in front of or actually in front of the automobile. His testimony was that he first saw decedent running in a southerly

direction and about four to six feet in front of his left fender. Later in the trial, he was recalled as a witness and cross-examined. At that time he again insisted that the lights on the cars approaching him affected his vision and prevented his seeing decedent sooner.

Though the evidence is undisputed that defendant was approaching or passing two or more oncoming cars at about the time of the accident, there is, however, testimony that shortly after the accident he made statements to the effect that he did not see decedent until he hit him, and to some witnesses he said nothing about being blinded by the lights of oncoming cars.

The testimony of the defendant and that of several witnesses called on behalf of the plaintiff disclose that defendant did not see decedent until about the time he stepped in front of the automobile. Viewed most favorably to the plaintiff, this evidence is sufficient to establish that defendant may have failed to keep a proper lookout. We are of opinion that the issue of whether defendant was negligent in failing to keep a reasonable lookout was properly submitted to the jury.

The following excerpts from the uncontradicted testimony of several witnesses establish the place, manner and circumstances under which Mr. Hancock, who was seventy-two years of age, undertook to cross that busy thoroughfare in the nighttime with traffic moving thereon in both directions.

Mrs. Hooker gave this version of the events:

"Q. I believe you were coming towards Roanoke, you were coming eastward?

"A. We were going east, and this man just seemed like run right in front of us and I said, Oh, Mr. Hooker you are going to hit a man and I did this (illustrating by putting hands over eyes) that is all I saw.

"Q. You said what?

"A. You are going to hit a man; I didn't say he hit, I said you are going to hit a man.

"Q. Tell the jury how this Mr. Hancock was traveling.

"A. He seemed to be running, moving fast, real fast.

"Q. Were there any other cars coming in the road?

"A. Yes, the road—there were cars coming and going.

"Q. You mean by going and coming going in the same direction that you were and approaching you.

"A. Yes.

"Q. Going east and west you mean?

"A. Yes, going east and west; that is what I mean.

"Q. What kind of lights, if any, did these cars have on them?

"A. Real bright.

"Q. Bright lights?

"Yes."

On cross-examination, she further said:

"Q. Whereabouts was the man with reference to your automobile in the street?

"A. He was right, real close to us, seemed to me like.

    \*       \*       \*       \*       \*       \*

"Q. Why couldn't you see this man before?

"A. The lights were blinding us."

Mr. Moore, on cross-examination, testified that the explanation given by Mr. Hancock when he visited him at the hospital was:

"A. I went—so l could fill out my report I went to the hospital and I asked Mr. Hancock his age, he gave it to me as 72.. I asked him how he was crossing the street and he said he had been over there and was crossing from the north side to the south side, going over to the filling station. I asked him what hit him and he said he did not remember, he did not know."

On Mr. Cawley's cross-examination, he testified that when he went to the hospital, Mr. Hancock, in undertaking to inform him how the collision occurred, gave the following account:

"Q. Did he tell you whether he ever saw this automobile or not, Mr. Hooker's car?

"A. Never did see it—he was getting out of the way of one was coming west on Melrose Ave.

"Q. And never saw Mr. Hooker's car?

"A. I don't think he did; he may have done it.

\* \* \* \* \* \*

"Q. You have just told us a few minutes ago that he said something about the cars going west, that he came over in front of the cars going west and got over in front of the car going east—you just told us that?

"A. He was crossing this way, you see (indicating) and he evidently got ahead of the cars going west and was coming and Mr. Hooker was coming east, that is about all he told me and also said if he had had one more step he would have been on the curb."

Mr. C. Q. Cox, an adjuster for the company that had liability insurance on defendant's car, interviewed Mr. Hancock at the hospital. In his testimony on behalf of defendant, he stated that Mr. Hancock, in explaining to him how he was injured had this to say:

"A. Mr. Hancock said he was crossing the street, Melrose · Ave., from the north side to the south side, he was crossing at a point about opposite the middle between the Esso Station and there is a barbecue stand which is not on the map there, he was crossing at a point between these 2 places, the Esso Station and the Barbecue stand. He started out into the street and he saw 2 cars or he said a couple of cars coming from his left which would be going west on Melrose Ave., he did not know the speed of them but they were coming fairly fast and they were close to him and he saw that they were going to hit him because he was already out in the street and he ran across in front of these cars.

"Q. These cars you refer to, were going in what direction?

"A. They were going west. When he got past where these cars were going, got past him without hitting him, he looked to his right and saw Mr. Hooker's car just a few feet from him and he was over in the street so far and he saw Mr. Hooker was going to hit him and he ran just as fast as he could to try to make the curb, and he was

about to the curb, I think he said he was 1 or 2 steps from the curb and the right front fender hit him.

    \*     \*     \*     \*     \*     \*

"Q. Was anything stated by him as to how close the cars were to him going west?

"A. No, sir, he did not say in feet; he would not say, as a matter of fact, he just didn't know, he said they were close. I asked him if he had seen Mr. Hooker's car before he started across the street and he said he did not know whether he saw it or not; that he did see it after he ran past these other cars.

"Q. Did he attempt to state how close the Hooker car was to him when he saw it?

"A. No, sir, he just said it was close and that he was in front of it and knew he was going to get hit unless he ran as hard as he could.

"Q. Did he make any statement as to whether he was walking or running?

"A. Yes, sir, he said he was running as hard as he could go after he got out past the center."

Mrs. L. E. Osborne was asked if Mr. Hancock made any statement to her in regard to crossing the street and her answer was: "He said—he kept telling me, 'If I had one more step, I would have made the curb' and said he did not see the car."

Whether decedent hastily walked or actually ran from behind or in front of one or more cars approaching from the east is not made clear. Yet, the above recited evidence conclusively shows that in the nighttime with automobiles moving in both directions, he left a place of safety on the north side of Melrose Avenue and hurriedly weaved his way through traffic approaching from the east and upon reaching a place of comparative safety in the center of the highway, then, without pause, actually ran on into the path of defendant's car which was dangerously near. He was instantly struck by that car which was in its proper traffic lane and moving at reasonable speed. That decedent was

guilty of negligence in so recklessly exposing himself to obvious danger cannot be denied.

In Huddy's Encyclopedia of Automobile Law, Ninth Ed., "Pedestrian's Duty", sec. 88, p. 155, we find such conduct condemned in this language:

"Darting in front of car. One who suddenly places himself immediately in front of a moving automobile which is readily observable is generally guilty of negligence *per se.*"

In sec. 99, p. 156, of that same work, it is also set forth that:

"If a pedestrian looks for approaching automobiles before attempting to cross a street or highway, he is presumed in law to have seen what he should have seen had his observance been careful and attentive. He cannot justify himself by saying that he looked and did not see the approaching car that injured him, when, if he had looked, he must have seen the car. Unless there is some circumstance or condition to excuse him, his failure to see the car constitutes negligence as a matter of law. However, the particular circumstances and conditions of the case may be such as to make the question of his negligence one for the determination of the jury."

From the evidence, we find here no saving fact or circumstance that can excuse decedent's reckless conduct.

Commenting upon the care imposed upon a pedestrian who undertakes to cross from one side of a street to the other in a city or town though such crossing be undertaken at a street intersection where the pedestrian is accorded the right of way, Chief Justice Campbell, in *Thornton* v. *Downes*, 177 Va. 451, at p. 458, 14 S. E. (2d) 345, said:

"When a pedestrian, in a city or town, steps from the sidewalk into the street at an intersection, the law imposes upon him the legal duty of ascertaining if any vehicular traffic is approaching from the left. If the way be clear, he has the right to proceed to the comparative zone of safety, which is the center of the street. Upon his arrival at the center of the street, he is under the legal duty of looking to his right for approaching vehicles, and while

the statute (section 2154 (126), subsection b), accords him the right of way, he would be guilty of contributory negligence which would bar a recovery for injuries suffered, if he attempted to assert his right of way in the face of approaching traffic dangerously near to him."

The above statement reciting the duty of a pedestrian who undertakes to cross a busy street attains added force when applied to one who crosses between intersections.

Each case presents its own problem. The only legal rule that can be laid down is that when undertaking to cross a street or highway, a pedestrian should exercise such care as an ordinarily prudent person would exercise under the existing circumstances, and especially when one attempts to cross a busy thoroughfare at night at a place other than a recognized pedestrian crossing, it is encumbent upon him to exercise reasonable care in looking for approaching traffic and to heed that which is dangerously near and open to ordinary observation. If, under such conditions, he carelessly undertakes to cross without looking, or, if looking, fails to see or heed traffic that is obvious and in dangerous proximity and continues on into its path, he is guilty of negligence as a matter of law. *Meade* v. *Saunders*, 151 Va. 636, 144 S. E. 711; *Stephen Putney Shoe Co.* v. *Ormsby's Adm'r*, 129 Va. 297, 105 S. E. 563; *Frazier* v. *Stout*, 165 Va. 68, 181 S. E. 377; *Jenkins* v. *Johnson*, 186 Va. 191, 42 S. E. (2d) 319; *DeMuth* v. *Curtiss*, ante, p. 249, 49 S. E. (2d) 250.

If decedent crossed the northern half of the highway in front of automobiles approaching from the east, as he said he did, then at no time was his view of defendant's car obstructed. If he emerged from behind one of the cars which was proceeding in a westerly direction, then while at or near the center of the road and from that point and time on until he carelessly and unwittingly placed himself in front of defendant's car and dangerously near thereto, there was nothing to prevent him from seeing and avoiding that vehicle had he exercised reasonable care under the circumstances.

■ Upon this evidence at the instance of plaintiff and over objection of defendant, the court instructed the jury under the doctrine of last clear chance. This, we think, was error.

It was the duty of defendant and decedent each to exercise reasonable care in keeping an effective lookout. Yet decedent having elected to cross a busy city street at a place other than a regular pedestrian crossing, that circumstance imposed upon him the obligation of being the more vigilant.

Defendant may have been momentarily blinded by lights of the oncoming cars, but there was no such condition to interfere with decedent's vision. If defendant was negligent in failing to see decedent, then it naturally and conclusively follows that decedent was equally, if not more, negligent in not seeing defendant's approaching automobile.

Nor was defendant under these facts and circumstances afforded a last clear chance to avoid striking decedent. For plaintiff to have been given a last clear chance instruction under the circumstances above recited, it first must have been shown that decedent was inattentive to his position of peril in which he had negligently placed himself and that after defendant saw him and realized or should have realized his inattentiveness, defendant failed to use reasonable care to avoid the collision. Until defendant saw decedent in front of his car, after which instant the evidence fails to disclose any way or means by which he could have avoided the accident, decedent enjoyed the same if not a better opportunity of seeing defendant's car than defendant did of seeing him and decedent was afforded equal opportunity of avoiding the accident.

If it be admitted that defendant was negligent in the lookout he maintained and so failed to see decedent in time to avoid the accident, then it must be conceded that decedent was equally negligent in failing to see defendant's car. In the exercise of ordinary care, he should have done so and avoided running or stepping in front of it when it was in dangerous proximity to him. When at the center

of the street, had decedent looked, he would have had a plain view of the approaching car. He was then confronted with a situation where his hasty onward progress made a collision inevitable. Yet, without properly looking, he hurriedly and carelessly proceeded on directly into that car's path when it was only some four to six feet distant.

The statement of Mr. Justice Spratley in the very recent case of *Stark* v. *Hubbard*, 187 Va. 820, at p. 826, 48 S. E. (2d) 216, is most pertinent:

"The plaintiff's own testimony convicts her of contributory negligence as the efficient and proximate cause of the collision. Her misjudgment of the distance of the approaching car and her quickened steps towards its oncoming path show that she failed to observe the ordinary rules of safety in the face of apparent danger."

It being clearly evident that plaintiff was not entitled to an instruction upon the theory that defendant was afforded a last clear chance to avoid the collision, we perceive no basis upon which the verdict and judgment can be sustained.

With the evidence viewed in the light most favorable to plaintiff, the fact that decedent was guilty of negligence stands out in bold relief. It appears conclusively that his inattentive and reckless manner of crossing the street did not merely create a condition out of which the collision arose but it was an immediate, efficient contributing cause of the collision.

The succinct statement of Chief Justice Hudgins in *Jenkins* v. *Johnson*, 186 Va. 191, 42 S. E. (2d) 319, is in point:

"Both defendant and decedent had equal opportunity to see each other and to avoid the collision. Neither exercised proper care. Decedent's negligence was a contributing cause of his injuries."

To permit recovery upon this undisputed evidence of the manner in which decedent undertook to cross Melrose Avenue would give to a pedestrian crossing a busy street between intersections the status and right of way accorded

him by section 2154 (123) and (126) when crossing within clearly marked crosswalks or at an intersection.

For the reasons stated, the judgment complained of must be reversed. As all the facts have been fully developed and appear in the record, final judgment will be entered for the defendant. These conclusions render it unnecessary to consider other assignments of error.

*Reversed and final judgment.*