[File No. 7314]

HENRY PACHL as surviving father of James Pachl, Deceased, Appellant v. GEORGE OFFICER, I. E. Officer, also known as I. O. Officer, Respondents.

(54 NW2d 883)

Opinion filed Aug. 26, 1952.   Rehearing denied Oct. 13, 1952

*Lyche & Lyche,* for appellant.
*Degnan, Hager & McElroy,* for respondents.

GRIMSON, J.   This is a suit for damages resulting from an automobile accident.   On the evening of Sept. 9, 1949, James Pachl, a single man, 22 years of age, together with his friend, Donald Voiss, a young man 21 years old, left Grand Forks in Pachl's dark colored, Ford car to go to a dance at Ardoch.   Before they left the city they bought six pints of beer, drank one each at the time and one after leaving town.   When they had

gone about eight or nine miles west on Highway No. 2 they had a flat tire. They drew to the north side of the road, almost if not entirely, off the pavement. There they left the car without lights or flares. The time was about 7:45 P.M. It was a clear night just turning dark. They found the tire was ruined and that the spare tire was flat. They drank a third can of beer each and decided to take off the spare and to stop a car for a ride into the city to have it repaired. Voiss began taking off the tire. Pachl was standing at his right. Voiss describes it this way:

"Well, we got some tools out of the car and started to take the tire off the back end of the car and I was taking the tire off as Jim was standing by my right side, and he happened to look up and seen the lights of a car coming so he started crossing the highway to flag it down and as he ran he said, 'Hurry up, Don, there is a car coming.' Shortly after that I heard the crash. . . .

Q. Did you hear the brakes screech just before the accident?

A. Oh, it came about all at the same time.

Q. There wasn't any—you might say, noticeable interim between the impact as you heard it and the screech of the brakes, is that right?

A. Not too much . . . just so close you couldn't hardly tell them apart.

Q. Where was Jim the first time you saw him after the impact?

A. He was laying, face down, on the shoulder of the road.

Q. Did you see him before he landed on the road?

A. Yes, he was just above the car.

Q. When you heard the brakes and the impact I take it you looked up?

A. Yes, I turned.

Q. Now, will you tell us, in your own language what you saw.

A. I turned around and I seen James body just coming up— just as it was above the hood and crashed into the visor of the car and flew about a few—couple or three feet above the car and then lit on the highway and rested on the shoulder of the road on the south side.

Q. Well, just so I understand it, I believe you mean to tell us he went clear over the top of the car?

A. Yes.

Q. And did you see any part of the car strike him?

A. Just the visor, that is all.

Q. So that you did not see the front part of the car, as shown in Exhibit A. strike him?

A. No.

Q. So I take it the screech of the brakes and sound of the impact and you looking up all took place just about simultaneously?

A. Yes.

Q. Did you move Jim or was he moved while you were there until they put him on the stretcher?

A. I turned him over on his back.

Q. Did he say any words at all after you came over there?

A. No.

Q. Is it your impression that he died almost instantly?

A. Yes."

The car that thus hit James Pachl was a 1948 Chevrolet, Tudor automobile, which had been driven between nine and ten thousand miles. It was in good condition, with four wheel, hydraulic brakes. At the time of the accident it was being driven by George Officer. The two Officers with their wives and one additional passenger, Inez Olness, had left Ryder, North Dakota, that morning and were on their way to Grand Forks on business. From there they had intended to go to Detroit Lakes. At the time of the accident George Officer claims to have been driving 45 miles an hour. Regarding the accident he testified:

"Q. Now, would you explain to the court and jury how the accident happened as you saw it?

A. I was just driving down the road and here came—I seen this figure right in the middle of the road and he leaped—

Q. You saw the figure in the middle of the road?

A. That's right, that is where I first seen him and he leaped and I caught him on this fender.

Q. And about how far was he from the car when you first saw him.

A. From his car?

Q. No, from your car?

A. From my car. Oh that would be hard to say. It was just—when I seen him I tried to miss him and it just happened that quick. I would say he wasn't 15 feet.

Q. From your car?

A. Yes.

Q. And how was he moving?

A. He was running and he leaped into the air.

Q. And from which direction was he coming and which way was he running?

A. He was going directly south; he was coming from the north.

Q. And you hadn't seen him prior to the time you mentioned?

A. No.

Q. And where did he come from?

A. Just out of the darkness.

Q. And do you remember what you did when you saw that figure ahead of you?

A. I slammed on my brakes.

Q. And did you do anything else that you recall?

A. I tried to swerve to the north a little bit to avoid hitting him. If I hadn't done that I would have got him right in the middle of the car.

Q. You tried to swerve to the north to avoid hitting him?

A. That's right, yes.

Q. Now, you mentioned he leaped. You know which way he was facing or anything about which way he was turned or anything when he leaped like that?

A. Well, his hands were above him and—I don't know, he was just all sprawled out. You didn't know what it was at first, but he was just sprawled out. Maybe twisted himself.

Q. And do you remember what happened after you hit him, to James Pachl? Do you know where he fell? I mean before you got out could you determine what happened to the body?

A. No, I couldn't. The hood flew up as soon as I hit him.

Q. I see.

A. And I had all I could do to try to stop without anything going wrong with us.

Q. You recall whether or not your car swerved?

A. It swerved a little after the impact.

Q. And you brought the car to a stop?

A. I brought the car to a stop.

Q. And did you have your lights on?

A. Yes.

. . . .

Q. And in your best judgment the best way to describe it was that he was running south from the north directly across the highway and he made a leap?

A. He made a leap.

Q. And you saw him some 15 feet prior to that and swerved to the north, to your left, to avoid him?

A. That's right.

Q. And the impact would be towards the right part of the car.

A. Yes.

. . .

Q. Now, what part of the highway were you on up until the impact took place?

A. South lane.

Q. And you weren't off onto the gravel shoulder of the road at any time?

A. No.

. . . .

Q. Would you be able to say which way James Pachl was facing at the time the car struck him?

A. Well that would be hard to say. I seen him in the air and he might have—I couldn't say which way he was.

Q. You don't remember of seeing him facing you or anything about that?

A. He seemed to be twisting like he would land like a broad jump or something. You always land, lots of times turning the other way.

Q. Just seemed to be twisting?

A. Yes."

Dorothy Officer, the wife of George was sitting on the right-hand side on the front seat. She describes the accident as follows:

"Q. And would you tell the jury in your own words what happened and about where it happened and the time it happened?

A. Well, it was getting dark and it was approximately eight or nine miles from Grand Forks and the first I seen was this boy that just leaped right directly in our path.

Q. Did your car strike that boy?

A. Yes, it did.

Q. And do you know about what part of your car struck him?

A. Well, it would be the side where I was sitting more.

. . .

Q. Now, can you tell the jury about how far James was from the front of your car when you first saw him?

A. Well, he was right there when I saw him.

Q. And were you looking forward at that time and immediately prior thereto?

A. Yes, I believe I was.

Q. Would you be able to say how far in front?

A. Well, he was, I would say—he would be in the air when I saw him.

Q. And did you notice what George did about that time?

A. Well he applied brakes immediately.

Q. And did the impact take place sometime after the brakes had been applied or—

A. No, I would say almost simultaneously.

Q. And in what way did you first see this man coming or in front of you? Can you say which way he was going?

A. Well he was going south, directly across the road.

Q. And can you tell from what you saw how he was travelling, whether he was walking or—

A. No, he was coming at a fast speed. It seemed like he just made a leap thinking maybe he would make it or—

Q. So he was running?

A. Yes.

Q. Now, how do you know where your car was when the impact took place with reference to its position on the highway?

A. Well, we were in the south lane of traffic.

Q. And did anything happen after the impact?

A. Well, I couldn't just say. We could have—

Q. To the car.

A. Well, from the impact there was a swerve.

Q. And what else happened. Anything fly up?

A. The hood flew up.

Q. And what did George do with reference to the car? Did he continue on or bring it to a stop?

A. He brought it to a direct stop.

Q. Did you notice what happened to James Pachl right after the impact? Do you recall?

A. Well, sitting on the right hand side as I was, he just seemed to land right directly down beside the pavement.

.  .  .  .

Q. I take it then that you didn't see James Pachl running at all; he was already in front of your car when you first saw him?

A. Well, he was in the air in his leap in front of the car.

.  .  .  .

Q. Did you see James long enough before the impact took place to be able to say which way he was facing when the car struck him?

A. Well, that—

.  .  . You can answer that yes or no.

.  .  . No.

Q. You wouldn't be able to say which way he was facing?

A. He was facing at the time of the impact?  ·  ·

Q. Yes.

A. Well, I would say south.

Q. And that's your best recollection?

A. Yes."

Inez Olness who was sitting with I. E. Officer in the back seat testified as follows:

"Q. Did you see the accident take place?

A. No I didn't.

Q. What indicated to you for the first time that an accident was about to take place or had taken place?

A. Well, I felt the sudden stop and then the thud—or not sudden stop; I mean thud and we swayed and then we came to a stop.

Q. And you did not see the impact or the accident at all?

A. No.

Q. All you felt was the thud in the car?

A. Yes.

Q. Were the brakes applied?

A. Yes.

Q. And then when did the car swerve?

A. Well, the hood flew up and you couldn't see anything in front of you. I mean I looked up and you couldn't see anything and it all seemed to happen at one time, the thud and the swaying and all.

Q. And did George Officer stop the car then?

A. Yes.

Q. And do you recall where he stopped the car?

A. Well, it was on the pavement.

Q. And do you remember which lane the car was stopped in?

A. Well, on the south lane and it was in our lane of driving."

A photograph of the car taken after the accident was admitted without objection. It shows the right, front light bashed in and the hood on the right side, almost straight below the front edge of the visor, was dented. The evidence shows that James Pachl was injured on his left side. The left side of his face was injured. There was a compound fracture of his left leg, the bones sticking out through his trousers. His skull was fractured. The evidence in the case indicates that the highway crossed a hollow and a low ridge west of the place where the accident occurred. The defendants admit that they did not see the Pachl Ford car at all.

Defendants claim to have been driving not to exceed fifty miles an hour. A very distinct skid mark, variously estimated

at from fifty to sixty-five feet long was found back of the Chevrolet in the south lane about two feet from the edge of the pavement. One witness testified that that skid mark began east of the Pachl car and ended about 15 feet west of where the Chevrolet stopped, still in the south lane.

Plaintiff tried to testify as to another skid mark about ten feet long coming in diagonally off the gravelled shoulder but that testimony is not very clear. The Chevrolet car was stopped from 35 to 50 feet east of the body.

The plaintiff as the surviving father of James Pachl, in behalf of himself and his wife and Pachl's brother and sisters brings this action for damages on account of the death of James. He claims the defendants were driving at a "high, unlawful, reckless speed and at said time and place failed to keep the proper lookout and to keep said automobile under control." The defendants made a joint denial, except admitting the accident, and plead contributory negligence on the part of the deceased, James. At the close of the plaintiff's case defendants moved for a directed verdict on the ground that the plaintiff had failed to make out a case. That motion was resisted and denied. Again, at the end of the evidence defendants made a motion for a directed verdict in favor of the defendants on the same grounds and on the further ground "that the decedent, James Pachl, was himself, guilty of contributory negligence at the time of the accident and that the same was the direct and proximate cause of the accident." Again objection was made and the motion denied. The whole matter was submitted to the jury who brought in a verdict for the defendant. No further motions were made and the plaintiff appeals from the judgment. He alleges errors in the proceedings of the trial and the admission of testimony and alleges the insufficiency of the evidence to justify the verdict and that it is against the law.

The decisive question here is whether under the evidence the verdict is in accordance with law.

This action is based on negligence. Negligence and contributory negligence are always questions of fact for the jury unless the evidence is such that but one conclusion can be deduced from the evidence by reasonable minds. Williams v. Minneapolis,

St. Paul and Sault Ste. Marie Railway Co., 57 ND 279, 221 NW 42; Bagg v. Otter Tail Power Co., 70 ND 704, 297 NW 774; Leonard v. North Dakota Cooperative Wool Marketing Assoc., 72 ND 310, 6 NW2d 576; Logan v. Schjeldahl, 66 ND 152, 262 NW 463; Skramstad v. Miller, 78 ND 450, 49 NW2d 652; Rokusek v. Bertsch, 78 ND 420, 50 NW2d 657; Lostegaard v. Bauer, 78 ND 711, 51 NW2d 761.

There is evidence on behalf of the plaintiff to warrant the submission of his case to the jury. Defendants admit they did not see the Pachl car, indicating that there might be a question about the lookout the driver was keeping. The driver claims he applied the brakes as soon as he saw the decedent come in view of his lights, some 15 feet ahead of him. The 50 to 65 foot long skid mark is somewhat contradictory of the distance the decedent was away from the oncoming car when first seen. The skid mark may also indicate that the Chevrolet was being driven at more than fifty miles an hour so could not stop in shorter space. So would the description of how Pachl was hit and thrown and the battered condition of his body. Then there is some evidence that the skid mark coming in from the gravelled shoulder of the highway might be construed as indicating loss of control of the car. From these circumstances reasonable minds might come to different conclusions. So clearly the evidence was sufficient to submit plaintiff's case to the jury.

Let us now consider the evidence of contributory negligence and the effect thereof. In the case of Costello v. Farmers Bank, 34 ND 131, 157 NW 982, this court said: "While the question of contributory negligence is usually one of fact for the jury, yet where . . . the facts are not in dispute, it becomes a pure question of law for the court." In Johnson v. Mau, 60 ND 757, 236 NW 472, this court said: . . . But it is well settled that when it appears affirmatively from the testimony of the plaintiff that his contributory negligence is so clear that reasonable minds cannot differ but must conclude from the evidence that there was contributory negligence, then it is a question of law for the court. (Citing cases.)" In Billingsley v. McCormick Transfer Co., 58 ND 913, 228 NW 424, this court held: "Contributory negligence is a complete bar to a recovery for damages

sustained in a collision alleged to have been caused by the negligence of another." See also Wilson v. Oscar H. Kjorlie Co., 73 ND 134, 12 NW2d 526; Ferm v. Great Northern Railway Co., 53 ND 543, 207 NW 39; Newton v. Gretter, 60 ND 635, 236 NW 254; Stelter v. Northern Pacific Ry. Co., 71 ND 214, 299 NW 310; Chase v. Thomas, et al, 7 Cal App2d 440, 46 Pac2d 200.

The books are replete with cases of injuries to pedestrians crossing a street or a highway. If a pedestrian walks onto a street or attempts to cross a highway without carefully observing the traffic and consequently walks in front of an on-coming car and is injured it is generally held that he is guilty of contributory negligence and cannot recover for the damages he suffers. Bosma v. Daniels, 250 Mich 261, 230 NW 199; Rhoads v. Herbert, 298 Penn 522, 148 A 693; Hooker v. Hancock, 188 Va 345, 49 SE2d 711; Tarter v. Wiggington's Adm't. 310 Ky 393, 220 SW2d 829.

The case of Bratvold v. Lalum, 68 ND 534, 282 NW 514, is very similar to the case at bar. In that case Albert Bratvold had been drinking. He was driving with one, John Ellingson from Devils Lake to Harlow. As they approached Harlow the automobile failed to function properly and they left it finally in the ditch. Then Bratvold and Ellingson talked about hailing a car. They met the defendant coming from the north. Ellingson walked ahead along the west edge of the highway. The court describes the accident as follows:

"As it passed Ellingson the car appeared to be about in the center of the road. Then Ellingson heard a thump and turned around and saw the car in the ditch on the east side of the highway. Ellingson ran over to the car as some of the occupants got out. Bratvold had been hit and was underneath the front bumper. He was either dead or died a few minutes thereafter. The occupants of the car were the defendant, Olaf P. Lalum, the owner and driver, his brother, Albert Lalum, who lives on a farm with Olaf about five and one-half miles southeast of Harlow, and Andrew Olson, their hired man. They had left Harlow about 11 o'clock that night in a 1936 Pontiac sedan that had been driven five or six thousand miles. The brakes and lights were in good condition, although there is testimony to

the effect that the left front brake did not work properly after the accident. Before reaching the point where the accident occurred, they drove up a hill. At the top of the hill they were travelling about forty to forty-five miles per hour. The south slope of the hill is not steep. It consists of several rises with short stretches between that are practically level. The accident occurred at the south end of one of these levels approximately 450 feet in length. The road at this point curves slightly to the east and back again to the section line. The road was somewhat icy. As they entered the curve the defendant saw Ellingson first and then Bratvold. They were walking along the west shoulder of the highway. Bratvold stepped out into the highway waving his hands. He then stepped back toward or near to the west shoulder and then walked east across the highway again still waving. The defendant was driving on the west side of the highway when he first saw Bratvold and Ellingson. The defendant turned to his left or to the east to get by Bratvold, who also kept on going east across the highway with the result that the car struck him on the east shoulder of the highway and continued on for sixty-five feet into the east ditch. The defendant applied his brakes but did not set them hard fearing loss of control of the car because of the icy road. Measurements showed that the brakes had been applied one hundred feet before the impact."

The case was tried to a jury. At the close of the testimony defendant moved for a directed verdict which was denied. The jury failed to agree on a verdict. Thereupon the defendant moved for judgment notwithstanding the verdict. Trial court denied the motion and defendant appealed. This court held that the conduct of Bratvold barred recovery and reversed the judgment of the District Court.

The evidence as to the conduct of the decedent, James Pachl, in the instant case has been set out in full. That evidence is not disputed in the least. James Pachl and Donald Voiss had decided to hail a car so that they could take the spare tire into Grand Forks for repairs. While Voiss was unfastening the spare tire from the back of the Pachl Ford, Pachl was standing beside him. All at once Pachl saw a light and telling Voiss to

hurry he ran off, apparently to stop the car. He was a young man of experience in driving cars and in the observation of cars on the highway. As the driver of automobiles for some years he, like all drivers, must have had some sense of the speed at which cars were being driven. His eyesight and general health were good. The weather was clear. There were no atmospheric conditions to interfere with his judgment. They were on a good highway. He started away from Voiss running and when the defendants first saw him he was running south and waving his hands. He finally seemed to jump or turn. Whether he thought he had reached a place of safety and turned to waive the car to a stop or whether he hadn't yet reached across to a place of safety but was trying to stop the on-coming car his action placed him in the south lane of the highway in front of the on-coming car and in a place of great danger. He did not use the precaution of the reasonably prudent man for his safety. His reckless actions overcame the presumption that a man will not act in a manner to endanger his life. He may have failed to realize the speed at which the car was coming but whether the defendants were negligent in their way of driving or not the accident would not have happened but for the actions of the decedent. Only one inference can be drawn from the facts. We have come to the unavoidable conclusion that his contributory negligence was a proximate cause of the accident which bars a recovery for his death irrespective of any negligence of the defendants.

Under such circumstances the granting of a new trial is without avail. Even if some of the alleged errors claimed by the plaintiff were removed on such trial the evidence regarding the actions of the deceased would be the same. Every person involved in the accident testified except Mrs. I. E. Officer, wife of the owner of the car who was ill at the time of the trial. Plaintiff would still be barred from recovery. In Schnell v. Northern Pacific Railway Co., 71 ND 369, 1 NW2d 56, 64, this court says:

"Considering the whole record we are confirmed in our opinion heretofore expressed that it is impossible to escape the conclusion that plaintiff himself was negligent and that this negligence was a proximate cause of the accident. We are also of the opin-

ion that there is no reasonable probability that any different result could be reached should a new trial be had."

In Hooker v. Hancock, 188 Va 345, 49 SE2d 711, numerous errors were assigned on rulings of the trial court. The court found decedent pedestrian guilty of contributory negligence as a matter of law and held that conclusion rendered it unnecessary to consider other assignments of error. In Ude v. Fuller, 187 Mich 483, 153 NW 769, the court found the plaintiff guilty of contributory negligence and held that: "In view of this conclusion, it is unnecessary to consider the other questions presented by the briefs."

The errors assigned by plaintiff in the conduct of the trial and the introduction of evidence even if sustained would have no effect on the result. Irrespective of said alleged errors the plaintiff could not recover because of the contributory negligence of the decedent. It is, therefore, neither necessary nor proper for us to pass on those alleged errors as the result does not in any way depend thereon. The sufficiency of the evidence was challenged by a motion for a directed verdict and the record clearly shows that the decedent was guilty of contributory negligence as a matter of law. The defendants were entitled to a verdict and judgment as a matter of law. The verdict of the jury for a dismissal of the action was, therefore, correct.

The judgment of the district court is affirmed.

MORRIS, C. J., and BURKE, SATHRE and CHRISTIANSON, JJ., concur.