## Richmond

JACQUELINE P. WATSON, ADMINISTRATRIX, ETC. v. VIRGINIA ELEC-
TRIC AND POWER COMPANY.

December 2, 1957.

Record No. 4704.

Present, Eggleston, Spratley, Buchanan, Whittle and Snead, JJ.

The opinion states the case.

*Charles E. Ford* and *Daniel W. Wilkinson, Jr.* (*Murray, Ford, West & Wilkinson*, on brief), for the plaintiff in error.

*Archibald G. Robertson* and *Harry Frazier, III* (*T. Justin Moore; William McL. Ferguson; Hunton, Williams, Gay, Moore & Powell; Ferguson, Yates & Stephens*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

On March 26, 1955, William McGinley Watson met instant death by electrocution while engaged in digging a well when a metal pipe, used by him and a fellow employee in connection with the digging, came in contact with an uninsulated high voltage electric wire. The electric wire was owned and controlled by the Virginia Electric and Power Company, hereinafter sometimes referred to as Vepco or the Power Company.

Jacqueline P. Watson, administratrix of the estate of her deceased husband, William McGinley Watson, brought this action against Vepco to recover damages for the wrongful death of her husband. The negligence alleged against Vepco was its failure to properly construct, insulate, operate and maintain the wire. Vepco denied that it was guilty of any negligence, and alleged on the other hand that Watson's death was due to his own negligence.

The case was tried before a jury on April 23-24, 1956; but the jurors were unable to agree upon a verdict, and a mistrial was declared. It came on again for trial on May 28-29, 1956, and the jury returned a verdict for the plaintiff in the sum of $20,000.

At the conclusion of the plaintiff's evidence, Vepco moved to strike it on the ground that no negligence of the defendant had been shown, and that it disclosed that Watson was guilty of contributory negligence as a matter of law. The motion was overruled. Again, at the conclusion of all the evidence, Vepco repeated its motion to strike upon the same grounds. The trial court took this motion under advisement, but allowed the case to go to the jury. The trial judge clearly indicated to counsel for the parties, out of the presence of the jury, that he was of opinion that Watson was guilty of contributory negligence as a matter of law, and said to them: "If we don't get a verdict, I am going to dispose of it myself."*

---

* At that time, there were pending in the same court two other actions, one for the death of Roosevelt Mosley and one for the death of Charles M. King, who were killed in the accident out of which Watson's death arose.

After return of the verdict, Vepco moved to set it aside upon the grounds assigned in its former motions to strike the evidence. The court, after hearing argument, and considering the briefs of the parties, thereafter filed a written opinion sustaining the motion, and accordingly the verdict in favor of the plaintiff was set aside and judgment entered for the defendant, Vepco.

On appeal, Vepco concedes that the evidence was sufficient to justify the jury's finding of its negligence in constructing and maintaining the uninsulated high voltage wire involved. The jury's finding and that concession removed from consideration all issues, save the question whether the court erred in setting aside the verdict upon the ground that Watson was guilty of contributory negligence as a matter of law.

Watson and Roosevelt Mosley were employees of Charles M. King, who owned a small machine shop in the City of Newport News, Virginia. On Saturday morning, March 26, 1955, they were engaged in sinking a well on the rear of the premises of their employer, 312 - 72nd Street, in the City of Warwick. King gave them instructions as to where he wanted the well dug, and thereupon left them on the premises engaged in and about the construction of the well. The point where Watson and Mosley were sinking the well was approximately two feet from a wire fence along the rear property line of King, and two feet, six inches from a point directly under a line of electric wires maintained by Vepco. These wires ran in an east-west direction on Vepco's easement along the rear property line of King's lot. The point where the accident occurred is in a thickly settled residential area, with apartment buildings and residences. On the top cross arm of the power line in question, there were four uninsulated wires, making up four separate circuits. The two exterior wires carried 3,450 volts, and the two interior wires served as a street lighting circuit. Below the cross arm, there was a three-wire secondary circuit for local service to residences and buildings, and below that was a telephone cable. The uninsulated high tension wires were twenty-six and one-half feet above the ground at the point where the accident occurred, and lower at this point than they were at any other point in the neighborhood. According to the uncontradicted testimony and the photographic exhibits, there was a clear view of the overhead electric wires from the ground where the well was being sunk. One could stand at the fence line and see the wires directly overhead. There was nothing

to obstruct the view of the decedent, Watson, and his fellow worker.

Watson was engaged in sinking the well by a common method of using city water pressure. A two-inch casing was being sunk in the ground. A three-quarter inch pipe was connected by a hose to the city water supply and water forced into the two-inch pipe to aid in working the latter pipe into the ground. The three-quarter inch pipe was capable of being used in sections, so that its length could be increased as the larger pipe was sunk into the ground. As obstacles were encountered, or as the depth increased, it was necessary to withdraw the three-quarter inch pipe and reinsert it, with or without additional sections. At the time of the accident, it had been extended to thirty-two feet, two and one-quarter inches. As stated in the written opinion of the trial judge, and as shown by the exhibit of the pipe in evidence before us, it was "cumbersome and to some extent flexible."

About two p. m., four or five hours after Watson had started to work, the three-quarter inch pipe came in contact with one of the high tension wires overhead about twenty-six and one-half feet above the ground. Both Watson and Mosley were killed by transmission of the electric current through the metal pipe to them.

There are no living witnesses to the tragedy. Mrs. C. M. King said she was attracted to the scene of the accident by the screams of her young son. She and her husband rushed to the back door of the house. She said that when she looked out of the door, Watson's back was to the rear fence and Mosley's back was to the garage, near the rear of the lot. They were on opposite sides of the pipe, facing each other and appeared to be glued to the pipe, and looking up "just like statues." She further said that each of them had both hands on the upright small pipe, one end of which was in the ground, and the other end against the electric wire, and that they were motionless. She and several other witnesses testified that the ground was covered with water, and there were arcs of fire as contact with the pipe was made and broken with the overhead electric wire. King picked up a hoe and "began to chop," trying to free Watson and Mosley from the pipe. As he advanced and entered the charged water area, he too was instantly killed.

Another witness, R. L. Gungle, who lived next door to the King home, came up almost immediately after King had fallen to the ground. Gungle said that Watson and Mosley were "leaning up against the fence, approximately at the fence post and either one or

both of them had their left arm outstretched holding on the three-quarter inch pipe," which was in contact with the overhead electric wire. He was not sure which one of them had his hand on the pipe.

Police Officer Walter A. Thon, who also arrived shortly thereafter, found the whole area charged with electricity, the smaller pipe against the high tension wire, and standing near the hole in which the larger pipe had been set. He said electricity was still flowing through the smaller pipe into the ground, accompanied by smoke, and that Watson's body was touching the two-inch pipe which was in the ground. The smaller pipe was bent over the wire before the current was cut off, and bent back and forth when the current was cut off.

Watson was twenty-nine years of age, a high school graduate, married, and the father of two children. Mrs. Watson said her husband never discussed anything with her that led her to believe that he knew anything about electricity. David Watkins, a fellow employee at King's Machine Shop, said Watson was an outside salesman, and he was unable to state whether or not Watson had any experience or particular knowledge of electricity. However, Watson's employment record, introduced in evidence, showed he had received considerable radio training while in the Army four years, that he had worked as a handyman, a semi-skilled occupation, in the electrical department of the Newport News Shipbuilding and Dry Dock Company, had worked at a Naval Supply Center where he operated electrically driven power machinery, and had attended regular periods of safety instruction where the dangers of electricity were discussed.

[■■] There is no dispute as to the principles of law involved. The only difficulty is applying the accepted principles to the facts before us.

Plaintiff vigorously argues that Watson had no particular knowledge of electricity, and did not know that the overhead wires carried high voltage. She says that the jury having rejected evidence that he had such knowledge and having found that he was not negligent in handling the pipe, the trial court was not justified in substituting its own conclusion and inferences for those of the jury. *Thress* v. *Hackler*, 155 Va. 389, 399, 154 S. E. 502; *Ellett* v. *Carpenter*, 173 Va. 191, 197, 3 S. E. 2d 370.

The legal presumption is that Watson was not negligent, and the burden of establishing his negligence was upon the Power Com-

pany. It is equally true that conflicts in the evidence and all just inferences that may be drawn therefrom should be resolved by the jury and when so resolved, the evidence must be viewed in the light most favorable to the jury's finding; but when the facts are certain and when reasonable men cannot be of two opinions as to the inferences to be deduced therefrom, then the matter is for the court, and not for the jury. *Davis* v. *Rodgers*, 139 Va. 618, 622, 124 S. E. 408; *Va. Elec., etc., Co.* v. *Wright*, 170 Va. 442, 446, 196 S. E. 580; *Va. Elec., etc., Co.* v. *Steinman*, 177 Va. 468, 473, 474, 14 S. E. 2d. 313; *Va. Elec., etc., Co.* v. *Courtney*, 182 Va. 175, 181, 182, 27 S. E. 2d 917; *Hooker* v. *Hancock*, 188 Va. 345, 49 S. E. 2d 711; *Norfolk Southern Ry. Co.* v. *Harris*, 190 Va. 966, 971, 59 S. E. 2d 110; *Northern Virginia Power Co.* v. *Bailey*, 194 Va. 464, 73 S. E. 2d 425.

In Virginia, it is settled that one who is guilty of contributory negligence which caused or efficiently contributed to his injuries is not entitled to recover damages therefor. 13 M. J., Negligence, § 26, page 538, and cases cited.

█ It has long been recognized that the danger of electrical energy is a matter of common knowledge to all persons of ordinary intelligence and experience. Its use as a motive power has become so general and widespread as to acquaint all competent persons with the fact that any line carrying electricity is dangerous.

In *Danville Street Car Co.* v. *Watkins*, 97 Va. 713, 715, 34 S. E. 884, we said this:

"We are indisposed to entertain at this day, when electricity is so generally applied as a motive power to machinery, a plea of ignorance of its dangerous properties, and it is unnecessary to do so in this case."

The above case was decided in 1900, and the knowledge of the dangerous properties of electricity by competent and intelligent persons is even stronger today when electric light, heat and power have been universally adopted and used in the multiple activities of our present day life in homes, offices, and industries. Cf. *Arkansas Power & Light Co.* v. *Hubbard*, 181 Ark. 886, 28 S. W. 2d 710, and *Peterson* v. *Minnesota Power & Light Co.*, 206 Minn. 268, 288 N. W. 588.

█ The evidence shows very clearly that Watson had knowledge of, and experience with, electricity far beyond that of the average person. His employment record negatives lack of such knowledge and experience. The testimony of Mrs. Watson and

David Watkins that they were unaware that he had such knowledge is not inconsistent or in conflict with the positive evidence which shows that he had been actively engaged for considerable periods in work involving the use of electric power and appliances.

Here Watson was working in the open, and almost directly under overhead electric power wires, which he saw or ought to have seen had he exercised the care which a person of ordinary prudence would have exercised, under a similar situation and under like circumstances.

If the thirty-two foot pipe had been perfectly rigid and straight and had been raised exactly perpendicular to the ground, it would have been only two feet and six inches from the wire. But as shown in evidence, it was unwieldy and flexible. Its movement a few inches at ground level could have caused its upper end to sway and bend towards or away from the wires. The pipe could have been disjointed when brought out from the casing in sections; but this was not done.

The only reasonable inference that could be drawn from the testimony of Mrs. King is that at the time of the accident, Watson was jointly participating with Mosley, either in removing the small pipe from the outer casing of the larger pipe, or attempting to reinsert it in the larger pipe. When the attempt was made, he had worked four or five hours under the electric wires, which all of this time had been in full view. The ground was covered with water from the drilling operation; the decedent's feet must have been wet; he had in his hands a lengthy metal pipe; and it was being used close to electric wires carrying high voltage.

The evidence is undisputed as to the above facts, and the presence of a dangerous situation, if the pipe was allowed to come in contact with the wire. It is obvious that Watson either did not look upward; or that he so looked and did not see what was plainly visible; or that he saw the wires but chose to disregard the danger their presence involved.

The danger was so reasonably apparent that there was no justification for Watson to disregard it, nor was there any evidence excusing his lack of ordinary care. The facts and all reasonable inferences from them lead us to the definite conclusion that Watson was unfortunately the victim of his own failure to use due and ordinary care under the circumstances. In the face of such facts and inferences, the presumption of his freedom from negligence does not prevail. The negligence of Vepco did not dispense with the

requirement of ordinary care on the part of the decedent. *Yeary v. Holbrook*, 171 Va. 266, 285, 198 S. E. 441.

Plaintiff relies upon *Appalachian Power Co.* v. *Hale*, 133 Va. 416, 113 S. E. 711; *Bly* v. *Southern Ry. Co.*, 183 Va. 162, 31 S. E. 2d 564; *Northern Virginia Power Co.* v. *Bailey, supra*, and a line of cases involving questions similar to those here.

The facts in the cases cited by plaintiff differ in various respects from those presented to us in this case. We have repeatedly held that whether a case should be left to the determination of the jury or be decided by the court must always turn on the facts in the particular case. Generally, negligence—all kinds of negligence—is for the jury and should not be taken from the jury "unless there is a plain deviation from the evidence or it is palpable that the jury have not drawn the correct inference from the facts." *Va. Elec., etc., Co.* v. *Wright, supra*, 170 Va. at page 446; *Steele* v. *Crocker*, 191 Va. 873, 880, 62 S. E. 2d 850; *Leo Butler Co.* v. *Wilbun*, 192 Va. 263, 268, 64 S. E. 2d 738.

In the *Hale* case, *supra*, the plaintiff knew nothing about electricity. He had no cause to suspect that a wire tied to a tree and sagging about five feet from the ground was carrying a deadly current of electricity, nor did the surrounding circumstances give him any reason to apprehend danger.

. In the *Bly* case, *supra*, the plaintiff was performing his duties as a flagman on a train of the Railway Company when he met his death. The train was engaged in a switching operation, with a number of its cars standing on a part of the railway line running over a bridge and other cars standing on the earthen roadbed. The determination of the case required a consideration of statutes not here involved.

The facts in the *Bailey* case, *supra*, are different from those here. In that case, the electric wires passed over a small part of a large orchard in which Bailey was working. In some places they were hidden from the view of a man on the ground. Bailey's opportunity to know of the danger was not as great as that of Watson. Watson had spent four or five hours working directly beneath, and in full view of the wires. Bailey was engaged in thinning trees, some of them near the wires and others far away. He was moving his aluminum ladder in an upright position just as he had been instructed, and the evidence suggested that he may have stumbled and slipped on the wet grass.

In this case, there was no necessity for Watson to take any risk.

As we have said, the electric wires were in plain view, the metal pipe he was using was somewhat flexible and unwieldy, and extended a greater distance than the wires were above the ground. By a slight movement, intentional or unintentional, at ground level, it could readily come in contact with the electric wires. There is no evidence from which it may be reasonably inferred that Watson either stumbled and fell against the charged pipe, or that he came to the rescue of his companion after the latter had been injured. There were no signs on the ground indicating skidding or slipping, and no outcry was heard by anyone. That Watson had hold of the pipe other than to use it in digging the well is a matter of speculation purely. That he was in contact with the pipe used in his work, and that the pipe was against the electric wire are established facts. Inferences must be based upon facts and not upon other inferences or mere speculation. The only reasonable inference from the evidence of Mrs. King, who was the first living witness to come upon the scene of the tragedy, is that Watson received his injury while he was engaged in inserting or withdrawing the smaller pipe from the larger pipe in his undertaking to dig the well.

The facts of this case, relating to the negligence of Watson, are somewhat like those in the case of *Trimyer* v. *Norfolk Tallow Co.,* 192 Va. 776, 66 S. E. 2d 441. Trimyer was injured by electricity transmitted through a crane from uninsulated high tension wires at thirty-five feet above ground level, while helping to repair a well. He saw the wires, knew of the dangerous properties of electricity, yet he directed a movement of the crane he was operating so that it came in close enough contact with the wires to transmit the electricity to his body. The trial court struck the plaintiff's evidence because it showed no negligence on the part of the defendant, and said that even if it had done so, the plaintiff was guilty of negligence as a matter of law.

Mr. Justice Buchanan, speaking for the Court in that case, reviewed a large number of cases and the authorities relating to notice or warning required to be given of the presence of high tension wires. Having arrived at the conclusion that the Power Company was not guilty of negligence, we found it unnecessary to consider the question of plaintiff's contributory negligence, and affirmed the judgment of the trial court.

We find no error in the judgment of the trial court, and it is accordingly affirmed.

*Affirmed.*