## Richmond

APPALACHIAN POWER COMPANY v. J. AUBREY MATTHEWS, ADMINISTRATOR OF THE ESTATE OF GILBERT DAVID HEATH, DECEASED.

HOME AND AUTO SUPPLY COMPANY, INCORPORATED v. J. AUBREY MATTHEWS, ADMINISTRATOR OF THE ESTATE OF GILBERT DAVID HEATH, DECEASED.

June 12, 1961.

Record Nos. 5230, 5231.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

The opinion states the case.

*Francis M. Hoge* (*Ralph R. Repass,* on brief), for plaintiff in error, Appalachian Power Company.

*Francis W. Flannagan*, for plaintiff in error, Home and Auto Supply Company, Incorporated.

*Ralph L. Lincoln* and *J. Aubrey Matthews*, for defendant in error, J. Aubrey Matthews, Administrator.

EGGLESTON, C. J., delivered the opinion of the court.

J. Aubrey Matthews, administrator of the estate of Gilbert David Heath, deceased, has recovered a verdict and judgment of $10,000 against Appalachian Power Company and Home and Auto Supply Company, Incorporated, for damages for the wrongful death of Heath, who, while engaged in the construction of a building, was electrocuted when he came in contact with an energized wire owned and operated by the first-named defendant and a television cable owned and operated by the latter defendant. The allegations of negligence were that Appalachian maintained its uninsulated and dangerous wires and that Home maintained its television cable in close and dangerous proximity to the place in which they knew or should have known that the plaintiff's decedent and others were engaged during the construction of the building.

In their separate appeals each defendant claims that the evidence fails to show that it was guilty of any negligence which was a proximate cause of the decedent's death, and that, in any event, the decedent was guilty of contributory negligence.

At the time of the accident which occurred on April 6, 1959, Heath was employed by Brodie Thompson in the construction of a two-story cinder block building in the town of Marion, Virginia. This building was across an alley from Thompson's main building in which he conducted a tire and farm machinery business. Appalachian served this latter building and business with electricity and for that purpose had erected in the alley, in 1955, a power pole which stood 34 feet above the ground. Electricity was conducted by wires from Appalachian's main line running along Church street, on which the Thompson main building fronted, to transformers attached to the pole where it was reduced from 2300 volts to 120 volts and carried thence into the building. Attached to the power pole were three 8-foot crossarms. The top crossarm supported three transmission wires from Church street. These wires ran from the top crossarm to insulators on the middle crossarm and thence by "jumper" wires

into three transformers located between the middle and bottom cross-arms. These jumper wires were uninsulated and carried 2300 volts of electricity.

In March, 1959, Thompson began the construction of the new building which was to be 60 feet long, 32 feet wide, two stories high, with a flat roof. The foundation was laid about 8 to 14 inches from the bottom of the power pole. At Thompson's request, a foreman of Appalachian moved a guy wire attached to the pole so as not to interfere with the location of the building, but there was no request that the pole itself be moved. The foreman did not ask, nor was he told, the height of the proposed building.

On the day of the accident the building had been constructed to the level of the roof rafters, along which a walkway had been laid for the use of the workmen. The top of the power pole leaned toward the side of the building, with the result that portions of the crossarms extended over the uncompleted building. The jumper wire attached to the insulator on the end of the middle crossarm was 6 feet and 8 inches above the level of the platform. While the evidence shows that such wires are not customarily insulated, the National Electric Safety Code requires that they be located at least 8 feet above the roofs of buildings.

Home and Auto Supply Company, Incorporated, is in the business of selling television appliances and service in Marion. It transmits television signals for its customers by means of a coaxial cable which runs throughout the town. This cable consists of an insulated wire, along which the signals are transmitted, supported by an uninsulated wire cable. The insulated wire carrying the signals uses a negligible amount of electric current, described as less than one-tenth of the voltage found in a flashlight battery. The coaxial cable can be handled with bare hands without any perception of an electric shock. Pursuant to an agreement between the parties, Home had attached this cable on Appalachian's poles throughout the town.

In 1956, Home installed a cable leading from an Appalachian power pole on Church street to the pole near the Thompson main building and thence, with Thompson's permission, across his property to that of another near-by customer of Home. This cable was attached to the pole near the Thompson building more than 8 feet below the nearest uninsulated wires. Neither Home nor any of its employees knew of the construction of the Thompson building or that it had been necessary to move this cable during the progress of the work.

Heath was 42 years of age, had been through the sixth grade at school, and employed by Thompson for several years as the operator of a tire recapping machine. He was familiar with electricity, knew of its danger, and that "sufficient electricity would kill him."

On the day of the accident the television cable ran across a portion of the building and was either lying on the rafters or was in close proximity thereto. F. K. Keesling, the foreman on the job, told Heath to move the cable, "to take it loose and throw it over the edge of the building," in order that the work on the building might proceed. Heath detached the wire from the pole, raised it several feet, and attached it to the end of the bottom crossarm extending over the building. Since the cable was "still sagging" and was in the way of the workmen, Keesling again told Heath to "take it loose and throw it over the edge of the building—it would be completely out of the way then." Heath still insisted that he could withdraw the slack in the cable, attach it to the crossarm, and thus get it out of the way. As Keesling said, he told Heath [referring to the jumper wires], "Watch those wires up there—they are hot." Heath then removed the leather gloves with which he had been working, continued to pull on the cable with his left hand, and in order "to get leverage," "reached up" with his right hand, caught hold of the energized jumper wire, and was killed instantly. Keesling was clear and positive in his testimony that he warned Heath before he "grabbed hold of the hot wire."

In addition to Keesling, three other witnesses saw the accident and testified that it occurred substantially in the manner which has been related. They agreed that the uninsulated jumper wires, which were about the size of a lead pencil, were plainly visible and that Heath deliberately "reached up" and caught hold of one of them. As one of the witnesses said, "he reached awful high." Another said the wire was above Heath's head and "He'd have to reach up to get it." Glenn R. Hilton testified that he warned Heath just as he caught hold of the wire, but that this warning was "too late."

There is no evidence to support the theory of the plaintiff that just before coming in contact with the energized wire Heath lost his balance, or stumbled, and grabbed the wire in order to prevent his falling. Indeed, those witnesses who were questioned on the subject testified that they saw no indication of this.

The witnesses agree that the current from the energized wire passed

through Heath's body and "was grounded" through the coaxial cable, thus causing his electrocution.

We need not stop to consider whether the related evidence is sufficient to show that either or both of these defendants were guilty of negligence which was a proximate cause of the accident. It is clear that the decedent himself was guilty of negligence which was a proximate cause of his death. He was a man of mature years and familiar with the use of electricity and its dangerous nature. Not only were the energized, uninsulated, jumper wires in plain view as he worked on the building, but he was warned of their proximity and danger a moment before the accident occurred. Notwithstanding this obvious danger and warning, he removed his gloves, which the evidence showed would have afforded him some protection, deliberately "reached up" "above his head" and caught hold of the wire, thus causing his electrocution and instant death. Plainly, such negligence on his part bars a recovery in this case. See *Williams* v. *Virginia Electric & Power Co.*, 173 Va. 179, 182, 3 S. E. 2d 365, 366; *Watson v. Virginia Electric & Power Co.*, 199 Va. 570, 575, 576, 100 S. E. 2d 774, 778, 779.

The trial court erred in not sustaining the defendants' motions to set aside the verdict. Accordingly, the judgment is reversed, the verdict set aside, and final judgment will be here entered in favor of the defendants.

*Reversed and final judgment.*