MATILDE COLÓN WIDOW OF DÁVILA ET AL., Plaintiffs and Appellees, *v.* PUERTO RICO WATER RESOURCES AUTHORITY, Defendant and Appellant.

No. R-62-93.        Decided May 7, 1964.

*José Antonio Arabía* and *Carlos M. Díaz Lamoutte* for appellant. *A. Mieres Calimano* for appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

Plaintiffs' predecessor, Emilio Dávila Díaz, lost his life by electrocution. Dávila was the principal stockholder and executive of a corporation—Rosalda Construction Corporation—which was constructing a housing project in the city of Humacao. Two high-tension lines crossed the parcel of land where the project was being built. A 38,000-volt line[1]

---

[1] The same poles used by the 38,000-volt line were used by another 4,000-volt line, but it was not in the latter where the accident occurred.

cut in half the parcel which was being urbanized. Another 4,000-volt line crossed one of the ends of the project. The latter only affected two lots. It was here where the unfortunate accident occurred.

While Dávila was operating a device—called a "scoopmobile"—for the purpose of pouring concrete in the foundations of one of the houses being constructed under the 4,000-volt line, the derrick of the scoopmobile came in contact with the wires. The wires were 20 feet 3 inches above land level. The derrick of the device was about two feet taller than the distance at which the 4,000-volt line was installed. When the derrick came in contact with the wires the motor of the scoopmobile stopped working, but since the vehicle was mounted on tires there was no discharge and it did not affect Dávila until he dismounted and started to manipulate the battery. The shock which caused his death was produced immediately.

The trial judge held defendant liable on the ground that "the fact of maintaining high-tension wires (4,000 volts) in a place where a housing project is under construction, where people travel back and forth and tall machinery is used, and there being a possibility that they may come in contact with the wires which may be bare, constitutes a prima facie case of negligence against the electric power company." And further on he says: "The high-voltage line was installed at an altitude of 20 feet 3 inches from the ground along land which at the time was open, thereby complying with the minimum safety requirements and the electricity codes, but the fact that the land was being developed for a housing project where tall machinery was used, changed the conditions and, therefore, defendant was under the duty to take greater precautions to protect the life of the people who worked there."

The trial judge determined as a matter of fact "that defendant had knowledge that the San Antonio Housing

Project was being constructed at the place of the accident, since on March 2, 1959 Clodomiro Vega, the project engineer, had requested in writing the relocation of the high-tension wires, and the Water Resources Authority was notified and served, since 1958, by engineer Florentino Cartagena, with a topographic blueprint showing all the high-tension lines lying on lands of the San Antonio Project, including that of the accident, and also because of the continued telephone and personal calls made by engineers Clodomiro Vega and Josué Díaz for the purpose of procuring the relocation of the high-tension line. Defendant Water Resources Authority maintains a district office in the town of Humacao under the direction of an electrical engineer whose office is located only five or six blocks from the lands of San Antonio Project, and his duty is, among others, to supervise, operate, and conserve the Water Resources Authority lines, and further, because long before the accident the San Antonio Project was a consumer of the Water Resources Authority."

Defendant challenges vigorously that part of the foregoing determination relative to the fact that request was made to defendant almost eight months prior to the occurrence to remove the line which caused the accident. We need not determine whether the trial court was correct in making the finding challenged. Even assuming that the relocation of the line which caused the accident was requested four or five days before the occurrence, the fact is that the evidence clearly establishes that the Water Resources Authority had knowledge that certain high-tension lines were located where the project was being constructed. This knowledge dated back to at least eight months prior to the occurrence of the accident.

Although it is true, as we stated in *Matos* v. *P.R. Ry. Lt. & P. Co.*, 58 P.R.R. 162 (1941), and in *Figueroa* v. *P.R.*

*Ry. Lt. & P. Co.*, 66 P.R.R. 463 (1946), and recently ratified in *Ramos* v. *Water Resources Authority*, 86 P.R.R. 572 (1962), that electric power companies "do not have the liability of an insurer, for they are liable only in those cases where through their fault or negligence damages are caused which are due to their failure to use a degree of care and diligence proportionate to the danger which the use of electricity carries with it." In *Matos* we said, citing from *Bunten* v. *Eastern Minnesota Power Co.*, 228 N.W. 332 (Minn. 1929), that "it is the duty of an electric company which maintains high voltage wires at places where people have the right to be, and *are likely to come in contact with them*, to guard against danger from the wires by effectively insulating them or by providing other sufficient safeguards."

We have seen that defendant knew in advance that a project was being constructed at the place where the accident occurred. It is common knowledge that devices which may easily come in contact with high-tension wires are used in numerous projects which are being constructed in Puerto Rico. As stated in *Kinsport Utilities* v. *Brown*, 299 S.W.2d 656, 69 A.L.R.2d 87 (1955), "we think it a matter of common knowledge for the last 15 years at least, that massive machinery and cranes with tall booms are more commonly used in construction work than other methods in excavating, road-building, bridge building, construction of office buildings, hospitals, etc."

■ The fact that at the time the high-tension line was constructed the site was not fully developed does not affect at all defendant's liability. It is the duty of the service entity to modify its lines in order to conform them to the safety required for the development of the land. Its duty is diligently to conform them to the new situation. In *Smith* v. *Appalachian Electric Power Co.*, 74 F.2d 647 (4th Cir. 1935), it was stated as follows:

"We are in accord with the rule applied in these decisions, and are thus of opinion that an electric power company, maintaining its wires on private property, is bound to exercise due care when other occupants, in normal and rightful use of the premises, erect structures in proximity to its lines, in the event that persons rightfully in, on, or about such structures for work, business, or pleasure, are thereby placed in a situation of danger, and the company knows, or with reasonable diligence ought to know, of the danger."

See, also, *Mississippi Power & Light Co.* v. *Walters*, 158 So.2d 2 (Miss. 1963); *Kinsport Utilities* v. *Brown, supra*.

■ Clearly defendant was negligent in not adopting in due time proper measures to make the lines less dangerous at a place where it knew a project was being constructed, where a great number of laborers were working with cranes and other devices which could easily come in contact with the wires which crossed the parcel being developed.

■ On the other hand, Dávila knew that the lines which crossed the parcel were high-tension wires. It is generally accepted that electricity is dangerous and that it is of common knowledge to every person of ordinary intelligence and experience. Engineer Vega, witness for plaintiff, said that "people know that any current kills" (Tr. Ev. at p. 145). "It has long been recognized that the danger of electrical energy is a matter of common knowledge to all persons of ordinary intelligence and experience. Its use as a motive power has become so general and widespread as to acquaint all competent persons with the fact that any line carrying electricity is dangerous." *Watson* v. *Virginia Electric and Power Co.*, 100 S.E.2d 774, 69 A.L.R.2d 1 (Va. 1957).

The aggrieved party was aware of the danger of the line, had requested that it be relocated and, being engaged in construction, the presumption is that he was acquainted with the safety rules promulgated in Planning Regulation No. 7, Div. 7, 23 R.&R.P.R. § 43–2509, which prohibits the use of

the type of machinery which he was operating near the high-tension wires.[2] The fact that defendant did not adopt precautions to insulate the wires did not excuse the aggrieved party whatsoever from acting with prudence and circumspection. At p. 143 of the Tr. of Ev. engineer Vega says: "It is not advisable to work in that area where there is installed a 4,000-volt line." It was the duty of the constructor, knowing of the danger of electric power lines, to require the company to cut off the service for the duration of the work or to use machinery which would not interfere with the wires. *Clough* v. *New England Telephone & Telegraph Co.*, 172 N.W.2d 113, 116 (Mass. 1961); *Wilson* v. *Texas Electric Service Co.*, 265 S.W.2d 624 (Texas 1954); *Buell* v. *Utica Gas & Electric Co.*, 182 N.E. 77 (N.Y. 1932); *Kimiko Toma* v. *Utah Power & Light Company*, 365 P.2d 788 (Utah 1961); Annotation, *Liability of Electric Power Company for Injury or Death Resulting from Contact of Crane, Derrick, or other Movable Machine with Electric Line*, 69 A.L.R.2d 93 (1960). It is interesting to note that the trial judge on a certain occasion in the course of the hearing expressed himself as follows:

"At this moment the court says that any action of any person under the same circumstances in which Mr. Dávila acted, as any other person could have done, was not proper and should not have been done by any person with knowledge of the circumstances existing at the place."

■ From the foregoing it appears that Dávila's negligence was greater than that of the Authority. The negligence of plaintiffs' predecessor was manifest. Although the regulation promulgated by the Planning Board prohibited the use of machinery such as that used by Dávila near high-

---

[2] The failure to comply with this regulation does not exempt the Authority from liability. The purpose of its provisions is for the protection of workmen. *Mississippi Power & Light Co.* v. *Walters*, 158 So.2d 2 (Miss. 1963).

tension wires and with knowledge of the danger of a high-voltage wire, he manipulated underneath the latter a device with a boom two feet longer than the distance between the line and the ground, and when the motor stopped upon coming in contact with the wires he got down, and without first ascertaining whether the boom had made contact with the wires, he started to handle the battery.

Defendant maintains that the compensation is excessive. It alleges that it was error to admit in evidence separate notices of deficiencies sent to the heirs of Dávila by the Secretary of the Treasury, and that it was likewise error not to order plaintiffs to answer certain questions of the interrogatory submitted by defendant in connection with Dávila's income. We need not consider whether or not the errors assigned were committed, since independently of that evidence the evaluation of the damages is reasonable. The indemnity of $25,000 for the wife and $5,000 for each of the twelve children is not excessive. However, since "concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity," § 1802 of the Civil Code, 31 L.P.R.A. § 5141, the indemnity awarded to the widow should be reduced to $5,000 and that of the children to $1,000 each. The award for attorney's fees will be eliminated.

The judgment, modified in the terms stated above, will be affirmed.