LÁZARO CONCEPCIÓN GUZMÁN ET AL., Plaintiffs and Appellants, *v.* PUERTO RICO WATER RESOURCES AUTHORITY, Defendant and Appellee.

No. 189. Decided June 7, 1965.

R. V. Pérez Marchand for appellants. José Antonio Arabía, Juan F. Doval, and Antonio S. Negrón García for appellee.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, pro tempore, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The question in the case at bar is whether the mental condition of conversion reaction of appellant, Lázaro Concepción Guzmán, is compensable, which condition ensued after experiencing quite a fright caused by an accident which was due to the negligence of appellee, the Puerto Rico Water Resources Authority.

Let us see first the following conclusions of fact of the trial court:

1—"That on January 21, 1957, a high-tension electric lighting post broke down in the vicinity of their [plaintiffs'] residence, causing the wires to cross each other producing a *thunderous explosion.*" (Italics ours.)

2—"That when the explosion occurred plaintiff Lázaro Concepción Guzmán was having lunch with his father, his wife and their children, who overcome with fright when a simultaneous explosion accompanied by sparks occurred in the house, ran out of the house to a nearby thicket in the open field. . . ."

3—"That after waiting for several minutes the plaintiff and his father returned to the house to see whether anything could be done for the protection of his property and upon reaching the house he felt dizzy, feeling cold, and hot, and at the same. time, as if he were sick at the stomach, with a desire to throw up but unable to do so, and suddenly losing consciousness and did not come to until later when he found himself at Clínica Dr. Maldonado Sierra . . ."

4—"That the provisional diagnostic made at said hospital was of anxiety and neurocirculatory asthenia; it was concluded afterwards that he was suffering from a *conversion reaction,* that his was a mental case, because he did not have any physical pathological injury at all." (Italics ours.)

. . . . . . . .

5—"That he has been treated by several physicians who have concluded that his is an hysteric personality case, formed slowly from what is inherited plus what is acquired in life and that is with that background that he has developed it. *That his. present condition is the result of a neurotic state in an established personality which existed prior to the occurrences* which give rise to this suit. That the paralysis of the leg, if there was any, is the product of a symptomatic fixation *but it cannot appear or be aggravated* as a consequence of an explosion." (Italics ours.)

6—"That plaintiff suffers from a hysteric or psychoneurotic condition known in the psychiatric field as conversion reaction or hysterical conversion."

7—"That the pseudoparalysis and the condition of sexual impotence *is not real, that is, it is imaginary,* even though plaintiff is not conscious of the fact that it is not real or imaginary." (Italics ours.)

8—"That the fact that *plaintiff* was *exposed to some manifestations of the accident* of the breakage of the post, did not cause plaintiff his psychoneurotic condition or hysteric personality, nor did it bring about the conversion reaction in which he substitutes the degree of anxiety he suffers for the apparent condition of paralysis and sexual impotence, because this conversion reaction is precisely the symptom of his psychoneurotic condition prior to the accident." (Italics ours.)

9—"That his illness *can be caused by motives other* than a fright; that they can be latent and manifest themselves from other causes of mental origin having nothing to do with a shock." (Italics ours.)

10—"That plaintiff has paid hospitalization, medicine and medical bills in an amount exceeding $500, which he shall continue to pay until he recovers his health completely; he has had losses in his business and both he and his wife have undergone suffering and mental anguish."

In his conclusions of law, the trial judge states that "the mental anguish suffered as a result of suppositions, imagination or fantasies of someone who alleges to suffer them are not compensable. [Citations omitted.]" "Neither shall compensation be granted for physical manifestations produced by imaginary or supposed mental disorders. [Citation omitted.]" The trial judge adds that "One is not responsible for consequences which are merely possible, but only for those which are probable according to ordinary and usual experience. (*Figueroa* v. *P.R. Ry., Light & P. Co.*, 66 P.R.R. 463, 469–70.)" In accordance with these conclusions of law, the trial court dismissed the complaint with costs to plaintiff not including attorney's fees.

The appellants assign five errors to the trial court, four of which, in synthesis, consist in not having concluded that appellee was negligent and that such negligence caused the injuries suffered by appellant.

█ In view of the conclusion it reached, the trial court did not have to make any determination on whether or not appellee was negligent regarding the breakage of the post in question with the accompanying results of the crossing of the electric wires and the explosions and sparks in and outside of appellant's home. Was the accident in this case due to the sole negligence of appellee? Its own employees testified that the post broke because it was rotten "about twelve feet from the ground"; that these posts are inspected twice a year; that said inspection should be done by hitting a pick

with a hammer and forcing it through the outer bark of the post to determine whether or not the latter is rotten inside; that the post must be tested lengthwise with that tool at intervals; *that if, following instructions, an inspection would have been performed the accident would not have happened;* that the post in question "showed a two-foot section rotten at the part where it broke"; "it was just a shell, but as it looked right on the outside, they assumed it was all right." Furthermore, a neighbor testified that five days before the accident he called a line supervisor's attention to the fact that "the center of the post was rotten, indicating that any wind could blow it down and that it was better to have it repaired," to which the supervisor for the appellee replied that "this post is cured from top to bottom and it lasts an eternity." We have accepted the principle that any line carrying electricity is dangerous. *Watson* v. *Virginia Electric and Power Company*, 100 S.E.2d 774 (Va. 1957), cited with approval in *Widow of Dávila* v. *Water Resources Authority*, 90 P.R.R. 316 (1964). Companies engaged in furnishing power do not have the liability of an insurer and, therefore, shall assume no liability unless damage has been caused by their fault or negligence in failing to use a degree of care and diligence proportionate to the danger involved. *Burgos Quiñones* v. *Water Resources Authority*, 90 P.R.R. 597 (1964); *Widow of Dávila, supra; Ramos* v. *Water Resources Authority*, 86 P.R.R. 572 (1962). The degree of care required in cases like this includes the obligation to perform periodical inspections. *Ramos* v. *Water Resources Authority, supra.*

In our judgment, it is foreseeable that when a high-tension line post breaks, the lines may cross and cause the accident which occurred in this case and on that account persons in the neighboring area may suffer psychic and physical injuries. *Burgos Quiñones* v. *Water Resources Authority, supra; Widow of Dávila, supra; Pabón Escabí* v. *Axtmayer,*

90 P.R.R. 20 (1964); *Cruz Costales* v. *Commonwealth,* 89 P.R.R. 102 (1963); *Ginés* v. *Aqueduct and Sewer Authority,* 86 P.R.R. 490 (1962); *Baralt* v. *Commonwealth,* 83 P.R.R. 268 (1961); and *Weber* v. *Mejías,* 85 P.R.R. 72 (1962); *Leatherman* v. *Gateway Transportation Co.,* 331 F.2d 241 (7th Cir. 1964).

■ Under the circumstances recited above it is evident that the breakage of the post, and the resulting explosions and sparks were due to appellee's negligence in failing to discover in time the deficiency of said post, and, furthermore, in not removing it when informed of its defective condition five days prior to the accident in question.

■ ■ It is a well-known rule that every illicit act of man which causes damage to another, when there is fault or negligence, is a source of obligation. The vast scope of §§ 1802 and 1803 of the Civil Code (31 L.P.R.A. §§ 5141 and 5142) justifies in these cases the granting of all damages actually suffered either in immediate or direct manner, or in mediate or indirect manner or which possibly and necessarily derive from or follow the wrongful act. Some time ago we criticized the common-law doctrine which requires that there must be an "impact" before moral or mental damages can be recovered as "being obsolete and failing to protect an important interest of the human personality." *Infante* v. *Leith,* 85 P.R.R. 24, 35 (1962).

The rather complicated problem in the case at bar is to determine, taking into consideration all circumstances and elements of judgment available, whether there exists causal relationship between the breakage of the rotten post and the psychic injury plaintiff is suffering.

The trial judge did not find any causal relationship— he made this determination when confronting the medical testimony—specifically that of two psychiatrists with different outlooks concerning the causal relationship.

■ We are dealing with the opinion of two informed persons, each one trying to emphasize such values which in his judgment favor his personal medical conclusion. Before going further, it is important to reiterate that this Court is free to adopt its own judgment in the weighing of expert testimony. *Commonwealth* v. *Fonalledas,* 84 P.R.R. 552 (1962); *Commonwealth* v. *Soc. Mario Mercado,* judgment of May 13, 1965.

■ Dr. Anthony L. Lombardi, Dr. Max Ramírez de Arellano, and Dr. Luis Montalvo Durán, psychiatrist, were witnesses for appellant. As a whole, the statements of these doctors—rationally analyzed, following a logical and realist outlook—point preponderantly to the existence of a causal relationship.[1]

---

[1] In weighing the testimonies of these experts we are taking into consideration the following points:

(1) their specialization and experience
(2) length of time they have treated the patient
(3) their medical opinion—comparing and analyzing it against material on that matter we have read.

See 6 Traumatic Medicine and Surgery for the Attorney, *Neuroses Following Trauma* 76. Dr. Henry P. Laughlin (Associate Clinical Professor of Psychiatry, George Washington School of Medicine), starts this chapter by saying:

"Some types of neurosis have a closer link with trauma than have others . . . but anxiety, hypochondriacal and conversion reactions are the most frequently encountered specific emotional patterns of reaction to trauma."

Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties, chapter 20, *Traumatic Neurosis,* especially § 20.31 on the causality problem as viewed under the heading of medico-legal aspects of the neurosis.

3 Lawyers' Medical Cyclopedia, ch. 19, *"Stress and Psychosomatic Diseases"* and ch. 20, *"Traumatic Neurosis."*

Brody, *Negligently Inflicted Psychic Injuries: "A Return to Reason,"* 7 Vill. L. Rev. 232 (1961–1962).

Torts, *Physical Injury Caused by Fright Compensable Mitchell Overruled,* 13 Syracuse L. Rev. 176 (1961–1962).

Smith & Solomon, *Traumatic Neuroses in Court,* 30 Va. L. Rev. 87 (1943).

Smith, *Relation of Emotions to Injury and Disease, "Legal Liability*

Let us see. Dr. Lombardi, who is a general practitioner, and who as Attending Physician at Clínica Maldonado signed the report on the patient's stay at the hospital, stated in said document, together with Dr. Hernández (intern doctor), that "the falling of an electric light post determined the physical-mental state of Lázaro Concepción Guzmán when he was admitted to that clinic." This doctor first examined the patient in 1957 and continued to treat him until 1958. The doctor states that appellant suffers a mental and nonorganic illness, that he is not faking and that he suffers from a conversion reaction in which insanity or fright turns into a physical illness. He says that the physical manifestation consists of a spasm and pain on the left arm and leg, on the left part of the neck, involuntary micturition and loss of sexual potency. Dr. Lombardi accepts that the explosion caused

*for Psychic Stimuli,*" 30 Va. L. Rev. 193 (1949).

M'Niece, *Psychic Injury and Tort Liability in New York,* 20 St. John's L. Rev. 1 (1949–1950).

Small, *Gaffing at a Thing Called Cause, Medico-Legal Conflicts in the Concept of Causation,* 31 Texas L. Rev. 630 (1953).

Losli, *A Legal Dilemma, "Injury Caused by Psychic Stimuli,"* vol. XL, No. 4, Denver Law Center Journal 209 (1963).

Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv. L. Rev. 1033 (1936).

Throckmorton, *Damages for Fright,* 34 Harv. L. Rev. 260 (1920–21).

Bohlen & Polikoff, *Liability in New York for the Physical Consequences of Emotional Disturbance,* 32 Colum. L. Rev. 409 (1932).

Goodrich, *Emotional Disturbance as Legal Damage,* 20 Mich. L. Rev. 497 (1921–22).

*Right to recover for emotional disturbance or its physical consequences, in the absence of impact or other actionable wrong,* 64 A.L.R.2d 100; *Negligence: fear of injury to another, or shock or mental anguish at witnessing such injury, as the subject of damages.* See, especially, the topic on: *"General principles as to recovery for mental or nervous effects alone,"* 18 A.L.R.2d 220, 222.

Oleck, *Cases on Damages,* ch. 6, *"Certainty"* 132 (1962).

It should be noted that medical literature has studied the traumatic neurosis as a physical injury in itself.

In the case at bar the conversion reaction—which medical authorities consider as one of the forms the traumatic neurosis assumes—manifests itself as a measure of the damages and mental anguish suffered by appellant.

the nervous shock. He says it is a shock similar to combat shock—with which he [the doctor] had experience during the war. He stated "that the illness, that state of anxiety, is produced by the prolonged nervous shock: the original shock of the explosion plus the prolonged state of anxiety during the succeeding days."

Dr. Max Ramírez de Arellano saw appellant in February 1957, four weeks after the occurrence. He is a neurosurgeon and testified in his capacity as expert on that branch of medicine. He testified that the patient's record and physical examination gave him the impression that the latter suffered from a *conversion reaction* and that this hysteria conversion was attributed to the fright he experienced. He stated that "it is a psychogenic condition of the mind which develops in persons with certain psychical characteristics and in which the body has to be predisposed to react in such manner. That the fright experienced [by appellant] was the trigger factor." Dr. Ramírez de Arellano explained that appellant "could have acted completely normal" prior to the occurrence. Elaborating further on his thesis, the expert says that "the predisposition was there but the symptoms appeared when the stove exploded." He explains that predisposition is "an individual facility for developing any condition" and that trigger agent is "the agent which acts upon a certain individual and makes symptoms appear as a result of that situation." He indicates that a person with a predisposition "could probably live a very normal life without experiencing any trigger episode."

Psychiatrist Luis Montalvo Durán has treated appellant in his professional capacity since June 9, 1958. He states that the patient has undergone "eight treatments" and that "he is still under treatment." This doctor testifies that "Taking the patient's record as a whole I concluded that he suffered a *psychical trauma* which manifests itself by symptoms

of asthenic conversion because he was exposed to the explosions for about ten or fifteen minutes." The doctor says that appellant is recovering physically but that he is psychically injured. On the present condition of appellant he stated "I have classified it as a mixed chronic moderate conversion reaction, mentally competent but with some emotional and physical limitation to fare adequately and normally in life." Dr. Montalvo Durán accepts that as a result of the accident appellant suffers from a psychical trauma which brought about the hysteric conversion and that if he had not suffered said psychical trauma on January 21, 1957 his psychical and neurological condition would not be what it now is. So, even though he says that "any accident would have awakened the fear," the doctor specifically points out to the explosion as the cause for appellant's reaction.

Dr. Juan A. Mascort, a neuropsychiatrist, was the only witness-expert introduced by the defendant party. This doctor explained that he made a 2-hour neurological and psychiatric examination of appellant. The former accepts that appellant does not have any organic injury of the nervous system and that his is a case of hysteric conversion without faking. He also testified that in this case the accident produced a state of anxiety in appellant. He added that "Anxiety is the first line of defense that persons have against a disagreeable situation from a psychical viewpoint. Anxiety is transitory, in most of the cases. The person starts a series of psychic defenses against anxiety. Everyday defenses we all use. Yes, we have a series of normal defenses, others that are abnormal . . . among them the hysteric conversion." Nevertheless, he said he does not believe that "any circumstance of this nature, such as an explosion, etc., produces the reaction Guzmán has had." He pointed out that "the spark (meaning the part of the accident which happened inside appellant's home) was, as colleague Ramírez de Are-

llano said, the 'trigger' which caused the acute anxiety. This was followed by another series of manifestations which deal with his personality. The conversion reaction, which has nothing to do with the anxiety, developed." According to the expert, the appellant previously had a hysteric personality. There are some aspects of Dr. Mascort's testimony which should be emphasized. All throughout his testimony one realizes that this doctor is extremely cautious in pointing out a specific fact as the cause for appellant's condition. The answer he gave to a question of the judge on whether "there are other causes which could have caused the symptoms he suffers" follows:

A.—"Yes, sir, I am sure there are some other causes *we don't know of* to produce this pseudoparalysis and among them we must consider, *although this is not like putting two and two together*; a person with a neurotic personality suffered this attack from his environment, he had this reaction. He was not hit by the current." (Italics ours.)

It is not proper to affirm that Dr. Mascort concluded that there was not a cause-effect relationship between the occurrence and appellant's present condition, because what the former states is that "I believe there is no relationship between the symptoms appellant presented when *I examined him* and the occurrence"; and that he considers it "difficult to pinpoint the essence of his illness." We believe this is the cautious asseveration of a reliable professional who is aware of the limitations that science itself imposes when trying to determine a cause-effect relationship especially when, as in the case at bar, the doctor-patient relationship was so ephemeral—scarcely two hours. Is that time enough for a physician to get familiar with the clinical picture of a person with an emotional disorder and accurately point out causes?[2]

---

[2] "Medical science is not a certain science today, and of course there will be many times when doctors disagree as to proximate causation of plaintiff's injury; this is not a new dilemma to courts." *Injury by Psychic*

It is convenient to cite here from the article *Psychic Injury and Tort Liability in New York*, 24 St. John's L. Rev. 1, 73, concerning the problems expert testimony introduces in cases of psychic injuries:

"The essential reason why expert testimony is admissible in any case is, of course, necessity. . . . The questions that arise in considering the admission of expert testimony are then:

"(1) Is the subject matter of the case one of peculiar complexity?

"(2) Is competent expert opinion available?

"It is believed that the conclusion is irresistible that the essential problem in the psychic injury cases is that of evidence. . . . The nucleus of the question is then the reliability of the expert testimony in this field inasmuch as the only even apparently valid method of establishing the extent of injury and the fact of causation is by expert testimony.

"Based upon the analyses which have been made in this article it is submitted that certain propositions in regard to expert neuropsychiatric testimony are well established. It appears clear, for instance, that a high proportion of the psychic disturbance cases involve plaintiffs who are victims of preexisting personality disorders. Preexisting mental disorders of mild and moderate nature are triggered by the psychic trauma or physical trauma occurring at the time of the accident and become so aggravated as to be easily observable. As a corollary to this proposition, it can be stated that so-called 'normal' individuals will not suffer psychic reactions from psychic or physical trauma unless such trauma be of long duration or great intensity. However, in the borderline cases no clear rule can be formulated to determine whether the reaction suffered by the plaintiff is a 'normal' one or an idiosyncratic one, and in the present state of psychiatric knowledge there inevitably must exist this 'shadow-land' area in which the experts themselves will disagree. Since everything depends upon the preexisting personality makeup of the plaintiff, the force of the stimulus . . . and

---

*Stimuli*, vol. XL, Denver Law Center Journal 209 (1963).

See the collection and comments of state courts on compensation and other aspects of damages when psychic injuries have been alleged: Lawyers' Medical Cyclopedia Supplement, *Traumatic Neurosis* 376–388.

the susceptibility of the plaintiff to the stimulus, a great possibility of disagreement among experts exists in the borderline situations. *It is here that the popular concept of psychiatry as an exact science must fall before the onslaught of pure fact*; for psychiatry, at best, is a combination of science and art." (Italics ours.)

The medical evidence established that appellant has a hysteric, neurotic personality; that he had to be predisposed to react the way he did; as witness Dr. Mascort testified, appellant's hysteric conversion was an abnormal psychic defense against the acute anxiety caused by the accident.

The expert testimony we have so briefly summarized leads us to the conclusion that there exists a causal[3] relationship between the accident and the psychic condition which appellant began to develop immediately after, until the onset of a state of hysteric conversion or conversion reaction and that, therefore, the appellee should be held liable for the moral damages suffered by appellants. *Leatherman, supra*; *Humphries* v. *Delta Fire & Casualty Company*, 116 So.2d 130 (La. 1959). See, also, *Batalla* v. *State*, 176 N.E.2d 729 (N.Y. 1961); *Irwin* v. *St. Louis-San Francisco Ry. Co.*, 30 S.W.2d 56 (Mo. 1930); *Sundquist* v. *Madison Rys. Co.*, 221 N.W. 392 (Wis. 1928).

The fourth error assigned by appellants refers to the denial of the compensation requested for the damages they suffered. In view of our conclusion holding appellee liable, we now have to determine the amount of the compensation to which the appellants in this case are entitled.

We are not absolutely free to deny or grant compensation for the damages caused, according to our discretionary judgment, but we must grant the appropriate amount in conformance with the findings proved. The indemnifying operation is rendered difficult when in the economic

---

[3] *Feliciano* v. *Industrial Commission*, 84 P.R.R. 188 (1961).
Cf. *Ortiz Candelario* v. *Industrial Commission*, 90 P.R.R. 378 (1964).

appraisal, elements which are not as manifest as physical damage or injuries come into play. But where it is determined, as we have determined, that damages have been caused and that they are the immediate or mediate consequence of the wrongful act, or that in one way or another they are derived therefrom, or that they necessarily follow it, the economic quantum which compensates said damages must be fixed taking into consideration the specific circumstances of the case: it is necessary to prove how those damages have affected the health, welfare and happiness of the injured person. *Ramos Rivera* v. *Commonwealth*, 90 P.R.R. 806 (1964); *Infante, supra; Hernández* v. *Fournier*, 80 P.R.R. 94 (1957). The fixing of the necessary and just amount to compensate for damages suffered[4] is left to the sound judgment, experience, and discretion of the trier. *Infante, supra; Arcelay* v. *Sánchez*, 77 P.R.R. 782, 807 (1955).

Appellant claims numerous damages, namely: (a) for the loss of his health and for his present physical incapacity; (b) for mental anguish; (c) for unforeseen disbursements and expenses he has had in his medical treatment; (d) for extraordinary expenses in the administration of his business; and (e) for repair expenses for home electrical appliances. Altogether, appellant claims the amount of $110,965 for the damages suffered. We have before us the following question, have all those damages been proved? Let us see. Even though it has been alleged that on account of appellant's condition

---

[4] In a case like the one at bar the trier's task is not an easy one, so the following has been said to that effect:

"In fact, it appears that nearly any case in which trauma has occurred is subject to contest. The determination of degree of liability, and the determination of a fair and equitable estimation as to the extent of damages, can well tax the judgment of a twentieth-century Solomon." *Emotional Disability and Compensation*, 6 Traumatic Medicine and Surgery for the Attorney 82.

See Oleck, Damages to Persons and Property, *Personal Injuries in General* 238 and ch. XIV, *Pain and Suffering* 247, esp. *Case Law on Psychosomatic Damages*, § 177F.

he has sustained losses in his business, the fact is that the evidence showed otherwise; appellant himself testified that the business "is booming, that is, that it is growing economically. It has soared and will continue to soar because there are lots of factories around, many people are going there and the other business in the neighborhood is more than two kilometers away. Instead of going down it is going up." And all this progress takes place under the direction and attention of appellant in spite of his mental condition; he apparently has not been disabled for that.

Regarding expenses for hospitalization, medicines and medical fees, the trial judge concluded that appellant had spent an amount in excess of $500. Although $140 were claimed for expenses in repairing the electrical appliances at appellants' home which were damaged as a result of the explosion which caused appellee's lines to cross, no evidence as to this expense was introduced. Appellant only testified that he had the stove fixed for $130 and offered to submit further proof of these damages, which he did not do.

There remains to estimate the amount of the compensation for the suffering and anguish sustained by appellant himself on account of his condition as well as those suffered by his wife.

It appears from the medical-expert evidence that appellant suffered from a mental condition prior to the accident, which consisted of "several psychic characteristics" or "fixation"; "he was afraid of becoming paralytic like his mother." On account of this condition, and the accident acting as the trigger, appellant developed the hysteric conversion or conversion reaction. As it has not been proved which part of appellant's conversion state is due to the preexisting condition and which to the trauma caused by the accident, nor that the preexisting condition was to aggravate in absence of the trauma, the appellee, whose negligence caused it, must be held liable for all the damages. *Intermill* v. *Heumesser*, 391

P.2d 684 (Col. 1964); *Watson* v. *Wilkinson Trucking Co.*, 136 S.E.2d 286 (S.C. 1964); *Evans* v. *S. J. Groves & Sons Co.*, 315 F.2d 335, 347–348 (2d Cir. 1963); *United States* v. *Fotopulos*, 180 F.2d 631 (9th Cir. 1950); *Rachal* v. *Bankers & Shippers Insurance Company*, 146 So.2d 426 (La. 1962); *Hazelwood* v. *Hodge*, 357 S.W.2d 711 (Ky. 1962); *Wise* v. *Carter*, 119 So.2d 40 (Fla. 1960); *Guillory* v. *Godfrey*, 286 P.2d 474 (Cal. 1955); *Owen* v. *Dix*, 196 S.W.2d 913 (Ark. 1946); *Castaldo* v. *Transportation Vehicles, Inc.*, 180 N.Y.S.2d 368 (1958); II Harper & James, The Law of Torts, § 20.3; Restatement of the Law, Torts, § 461; Prosser, Law of Torts 248 (3d ed.).

We must now make a brief summary of the suffering and anguish experienced by appellant since the accident. He testified that when he returned to the porch of his home from the nearby thicket to which he ran with his family when they heard the explosion outside and "the smoke and fire in the kitchen"—in some electrical appliances—he began to feel cold, was nauseated, fell down and was unconscious until after he found himself at Clínica Maldonado where he stayed for two or three days. Dr. Hernández noticed a slight spasm and palpitations; when he was admitted to the clinic on January 21, 1957, the patient was nervous, excited, perspiring heavily and complained of stomach disorders; two days afterwards he complained of dizziness; next day he claimed to have torticollis; his head was inclined towards the right; he left the hospital on his own volition. Appellant said that when he left the clinic he felt his left side was paralyzed; he had involuntary nocturnal emissions of both urine and semen; he went to Clínica Pereira in the Professional Building where he stayed 22 days. He felt the same symptoms but started to recover slowly. Dr. Ramírez de Arellano examined him there and testified that appellant was nervous and weak, paralyzed on his left side; complained of pain on the right side of the neck, of weakness in the left arm and leg and

of a headache on his left side; he had very noticeable intermittent shakes of the left side of his head and body; dragged his left leg; he was suffering from a conversion reaction. Even though his brain nerves were intact and "their performance was all right," he was not faking the symptoms he suffered. Dr. Ramírez saw this patient again in October of that year and noticed that the conversion reaction was about the same, he felt the same symptoms and complained of sexual impotence. After leaving Clínica Pereira he had to walk with a cane and even then he took two or three falls; he dragged his left foot; felt the left side of his head was about to explode, "as if your head were full of water and wanted to get out." Dr. Lombardi treated him and testified that the patient showed all the same symptoms Dr. Ramírez de Arellano noted. Dr. Lombardi referred him to Dr. Montalvo, a psychiatrist who had been treating him since June 1957. This doctor says that by January 1959 the patient had recovered noticeably. "Especially from the emotional condition which was manifesting itself in bad temper, irritability, lack of spirit and a tendency to accelerate, fright, insomnia, nightmares during which he fought in his sleep, he got up to fist fight . . . he is now losing the tension . . . there still remain some psychosomatic symptoms like the pain in the nape of the head, movements of the neck muscles, senescent sensations in the head. . . . Both his left side and his neck are still weak. . . . He continues to feel tired because he really drags his left leg when he walks. . . . He is psychically injured . . ., he will improve with the years . . . he needs psychiatric treatment indefinitely." He has partly recovered his sexual potency. Belén González, appellant's wife, testified that she did not see her husband again for three days because after the accident he was taken from their home to a clinic and every time she arranged to visit him their four children started to cry and she was thus prevented from leaving. About a month after appellant was back from

the hospital he started to give her very bad nights and that went on for many months. She says "I hardly slept at night because he would get up acting crazy, wanting to leave, slamming doors, throwing punches in the air and I was afraid he would hit the children or myself, so I was unable to sleep. Sometimes he would wet his bed and I had to change him constantly. Other times he would begin to scream." She used to massage his leg and arm as she was instructed; that on account of that situation she has suffered very much; that she has not had sexual intercourse with appellant since the accident because although he has tried has been unable.

Under the circumstances summarized herein we estimate that all the moral and material damages suffered by appellant amount to $15,000 and those of his wife as a result of the accident caused by appellee's negligence to $1,000; *Leatherman, supra; Humphries, supra.*

For the reasons stated the judgment entered by the trial court in this case will be reversed and another entered instead ordering appellee to pay appellants the amount of $16,000 as compensation for the damages they have sustained.